UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

My Big Coin Pay, Inc., Randall Crater, and Mark
Gillespie,

Defendants,

Kimberly Renee Benge, Kimberly Renee Benge
d/b/a Greyshore Advertisement a/k/a Greyshore
Advertiset, Barbara Crater Meeks, Erica Crater,
Greyshore, LLC, Greyshore Technology, LLC,

Relief Defendants.

Case No. [_____]

ECF Case

**COMPLAINT FOR INJUNCTIVE
AND OTHER EQUITABLE RELIEF
AND FOR CIVIL MONETARY
PENALTIES UNDER THE
COMMODITY EXCHANGE ACT
AND COMMISSION REGULATIONS**

**JURY TRIAL DEMANDED**

## I.   INTRODUCTION

1.      Since at least January 2014 through the present, the company My Big Coin Pay,

Inc. ("MBCP"), Randall Crater ("Crater"), and Mark Gillespie ("Gillespie") (collectively,

"Defendants"), operated a virtual currency scheme in which they fraudulently offered the sale of

a fully-functioning virtual currency, My Big Coin ("MBC"), a commodity in interstate

commerce.  From at least January 2014 through at least June 2017, Defendants obtained more

than approximately $6 million from at least twenty-eight customers ("MBC Customers") through

fraudulent solicitations.

2.      Defendants fraudulently solicited potential and existing MBC Customers

throughout the United States by making false and misleading claims and omissions about MBC's

value, usage, and trade status, and that MBC was backed by gold.  In this regard, the MBC

website, maintained and operated by Defendants, conveyed to potential and actual MBC
Customers numerous solicitation materials, MBC trade data, and other materials (1)
misrepresenting that MBC was actively being traded on several currency exchanges, including
the MBC Exchange website (https://mybigcoinexchange.com), when in fact it was not; (2)
misrepresenting in reports the daily trading price, when in fact no price existed because MBC
was not trading; and (3) misrepresenting that MBC was backed by gold, when in fact it was not.
In reality, the supposed trading results were illusory, and any payouts of funds to MBC
customers were derived from funds fraudulently obtained from other MBC Customers in the
manner of a Ponzi scheme.

3.      As MBC Customers began to raise questions about their MBC accounts,
Defendants attempted to conceal their fraud by providing additional coins to them and falsely
representing that they had secured a deal with another exchange to trade MBC.  Defendants
encouraged MBC Customers to refrain from redeeming their MBC holdings until MBC was
active on this "new" exchange.

4.      Defendants misappropriated virtually all of the approximately $6 million they
solicited from MBC Customers.  Defendants used these misappropriated funds to purchase a
home, antiques, fine art, jewelry, luxury goods, furniture, interior decorating and other home
improvement services, travel, and entertainment.  As a result, MBC Customers have lost most, if
not all, of their  funds due to Defendants' fraud and misappropriation.

5.      Through this conduct, Defendants were engaged, are engaging, or are about to
engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7
U.S.C. §§ 1-27f (2012), and the Commission's Regulations ("Regulations"), 17 C.F.R. pt. 1-190

(2017), specifically, Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a),
17 C.F.R. § 180.1(a) (2017).

6.      Defendants funneled customer funds or arranged for customers to send their funds
to the accounts of Kimberly Renee Benge, Kimberly Renee Benge d/b/a Greyshore
Advertisement a/k/a Greyshore Advertiset, Barbara Crater Meeks, Erica Crater, Greyshore, LLC,
and Greyshore Technology, LLC (collectively "Relief Defendants"). The Relief Defendants
have no legitimate claim to the customer funds they hold, or they have collected, all of which
were obtained as a result of the Defendants' fraudulent conduct.

7.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the
Commission brings this action to enjoin such acts and practices and compel compliance with the
Act. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief
including, but not limited to, trading and registration bans, restitution, disgorgement, rescission,
pre- and post-judgment interest, and such other relief as the Court may deem necessary and
appropriate.

8.      Unless restrained and enjoined by this Court, Defendants are likely to continue to
engage in the acts and practices alleged in this Complaint and similar acts and practices, as more
fully described below.

## II.     JURISDICTION AND VENUE

9.      **Jurisdiction**. This Court has jurisdiction over this action under 28 U.S.C. § 1331
(2012) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that U.S.
district courts have original jurisdiction over civil actions commenced by the United States or by
any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the
Act, 7 U.S.C. § 13a-1(a) (2012), provides that district courts have jurisdiction to hear actions

3

brought by the Commission for injunctive relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in, an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

10.     The Commission has anti-fraud authority over the conduct and transactions at issue in this case pursuant to Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

11.     **Venue**. Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants are found in, inhabit, or transact business in the District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.   As alleged in this complaint, Defendants fraudulently solicited numerous customers in the District of Massachusetts, receiving in excess of $5 million from those customers.

### III.     THE PARTIES

12.     Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.   The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

13.     Defendant **My Big Coin Pay, Inc.** is a corporation based in Las Vegas, Nevada. MBCP was incorporated on October 9, 2014.   MBCP's last known address is 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.   MBCP has never been registered with the Commission.

4

14.     Defendant **Randall Crater** is a resident of East Hampton, New York. Crater is a founder of MBCP. Crater has never been registered with the Commission.

15.     Defendant **Mark Gillespie** is a resident of Hartland, Michigan. Gillespie solicited MBC Customers on behalf of MBCP and Crater. Gillespie has never been registered with the Commission.

## IV.     RELIEF DEFENDANTS

16.     Relief Defendant **Kimberly Renee Benge** ("Relief Defendant Kimberly Benge") is a resident of State Road, North Carolina. Benge is Crater's sister. Benge has never been registered with the Commission.

17.     Relief Defendant **Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset** ("Relief Defendant Greyshore Advertisement") maintained its business address at 1643 Old Highway 21, State Road, North Carolina and is operated by Benge. It also used the address of 81 Newtown Lane, Suite 328, East Hampton, New York. It has never been registered with the Commission.

18.     Relief Defendant **Barbara Crater Meeks** is a resident of Elkin, North Carolina. She is Randall Crater's mother. Meeks has never been registered with the Commission.

19.     Relief Defendant **Erica Crater** is a resident of East Hampton, New York. She is Crater's wife. Crater has never been registered with the Commission.

20.     Relief Defendant **Greyshore, LLC** ("Greyshore") is a limited liability company based in Longwood, Florida. It was formed on May 17, 2010. Greyshore's last known address is 280 South Ronald Reagan Boulevard, Suite 203, Longwood, Florida but previously it used the address of 81 Newtown Lane, Suite 328, East Hampton, New York. Crater is the CEO of Greyshore. Greyshore has never been registered with the Commission.

5

21.     Relief Defendant **Greyshore Technology, LLC** ("Greyshore Technology") is a limited liability company based in East Hampton, New York.  It was operational from at least January 2014 through at least June 2017 and its last known address is 81 Newtown Lane, Suite 328, East Hampton, New York.  Crater is the CEO of Greyshore Technology.  Greyshore Technology has never been registered with the Commission.

### V.     STATUTORY BACKGROUND

22.     Virtual currencies are encompassed in the definition of "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).  For the purposes of this Complaint, a virtual currency means a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.  Virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

### VI.     FACTS

**A.     Defendants Made False and Misleading Representations, and Omitted Material Facts, To Solicit MBC Customers**

23.     From at least January 2014 to present, in an effort to capitalize upon the public's heightened awareness of, and interest in purchasing, virtual currencies, Defendants solicited potential MBC Customers to purchase MBC, a virtual currency with a similar sounding name to a more commonly known virtual currency, "Bitcoin."  Defendants also solicited MBC Customers to invest in MBCP by purchasing both stock in a company which had merged with MBCP and alleged licenses related to the medical marijuana business and marijuana derivative products such as Trokie, a marijuana-based lozenge.

6

24.     Defendants solicited potential MBC Customers and, along with the Relief Defendants, received and directed deposits, withdrawals, and transfers of MBC Customer funds.

25.     In their promotion of MBC, Defendants claimed that "merchants and consumers [could] process transaction with our new digital currency [MBC]" on the MBC website. Defendants further claimed that "any person with a valid email account [could] receive my big coins (MBC)," and "MBC is quoted, at the current value of the coin that day." Defendants provided MBC Customers with access, via the MBC website, to their individual accounts which reported their MBC balances, transactions, and the current value of MBC.

26.     Defendants' solicitations to potential MBC Customers to purchase MBC included false and misleading representations and omissions of material facts—in short, lies and deceit—about MBC's active trading status, rising prices, and the currency's merits.

27.     Defendants made these false and misleading representations and omissions of material facts to potential MBC Customers from at least January 2014 through at least June 2017 via the MBC website, YouTube videos, press releases, and posting on various social media platforms, such as Facebook and chatroom websites.

28.     For example, Defendants posted a YouTube video in which Defendants claimed that MBC was a fully-functioning virtual currency that could be used to buy goods and services, and that was actively trading on "several currency exchanges . . . for dollars, euros, and more" and stated that MBC was the only virtual currency backed by gold to give prospective customers the illusion that MBC was safe to purchase. The video directed potential MBC Customers to visit the MBC website, www.MyBig Coin.com, for more information. The MBC website later claimed that MBC could be traded through the MBC Exchange. Further, in the same YouTube video, Defendants claimed that MBC could be purchased, sold, traded, donated, and used to

7

make purchases, and that MBC was "a global currency that lets you send money anywhere, anytime in any currency." The YouTube video also contained the representation that MBC had partnered with MasterCard with the promise that MBC could be used anywhere MasterCard was accepted. These representations were false. The MBC website reiterated the MasterCard association. In addition to promoting an alleged agreement with MasterCard on the MBC website, the logos of the credit card companies American Express, Visa, and Discover also appeared in order to promote a pretense of legitimacy. On November 4, 2014, Defendants issued the following press release on CISION, which advertises itself as a "PR Newswire" (https://www.prnewswire.com/news-releases/mybigcoinpay-incs-co-founder-randall-crater-announces-the-crypto-currency-exchange-companys-agreement-to-have-its-own-branded-master-card-attached-to-its-e-wallet-281455731.html) which contained a link to other CISION MBCP press releases and read in part:

> *MyBigCoinPay Inc.'s Co-Founder Randall Crater Announces the Crypto-Currency Exchange Company's Agreement to have its own Branded Master-Card* [sic] *attached to its e-Wallet . . .*
> MyBigCoinPay Inc., a Nevada Corporation and a worldwide exchange portal for Crypto-Currency transfers, trades and buy [sic] and [sic] sell services announces today that it has reached an agreement with TRUCASH aka DCR Strategies Inc, a Canadian Corporation, for the implementation of a customized branded pre-paid master card [sic] program. Whereby [sic] cardholders will have access to their e-Wallet funds 24/7 enabling them to purchase MyBigCoin, the exchanges [sic] branded Crypto-Currency, along with buying products, goods and services worldwide in real time.

These statements were false because at the time of the statement and afterwards, MBCP did not have such an agreement with TRUCASH.

29. The MBC website also contained a link to "the MBC Mall," a website which advertised that "you can purchase any of the products we have using your MBC." Products purportedly offered for sale included Apple and Sony electronics. The contact page on the MBC

Mall shows that it shares the same mailing address of Relief Defendants Greyshore and Greyshore Technology, entities operated by Crater.

30.     Furthering the illusion of MBC's value, MBC Customers could monitor their purchases and sales of MBC through their account on the MBC website. MBC Customers could also view the purported current price of MBC on the MBC website and could view or participate in MBC trading on the MBC Exchange website. For example, on September 21, 2015, the MBC Exchange website reported the last exchange trade of MBC at $410 USD; a high trade at $500 USD and a low trade at $60 USD. The website also additionally reported the latest trade volumes and prices.

31.     These statements by Defendants were false and misleading representations and omissions of material facts. In fact, MBC was not actively traded on any currency or other exchange, was not backed by gold, was not associated with MasterCard or any other credit card company, and could not be used "to send money anywhere, anytime in any currency."

32.     Further, while the MBC website reflected that MBC Customers owned a certain number of MBCs, these account statements were false and misleading representations and omissions of material facts. For example, MBC Customers could not exercise any ownership rights in relation to their MBC because they could not trade their MBC or withdraw funds from their individual accounts.

33.     Defendants' statements about the daily price or value of MBC were also false and misleading and omitted material facts. From at least January 2014 through at least June 2017, Defendants arbitrarily changed the "price" or value of MBC to make it appear as though it fluctuated in an effort by Defendants to replicate price changes that might be observed in any other actively traded commodity. For example, on September 23, 2015, the reported price of

MBC on the MBC website was $389.86 USD and on November 9, 2015, the reported price of

MBC on the MBC website was $547.34 USD. When one MBC Customer questioned Gillespie

about the fluctuation in MBC's price, Gillespie admitted that Crater would arbitrarily change the

price, indicating the price was not based on actual trading. The increasing prices for MBC on the

website and the MBC Exchange website were illusory and false.

34.     From at least January 2014 through at least June 2017, Defendants echoed the

false and misleading representations and omissions of material facts contained on the MBC and

MBC Exchange websites regarding the rising value or price, usage, and gold-backing of MBC,

on social media accounts they controlled. For example, on the MBC Facebook page, Defendants

solicited potential MBC Customers by touting the rising trading value of MBC in U.S. Dollars

through statements such as the following false and/or misleading postings related to supposed

MBC value or price, usage and relationship with MasterCard, and backing by gold:

**A.     Value or price**

    i.     January 27, 2014: "Today current value is $28.87 USD."
       Gillespie posted a comment to this post on February 10,
       2014 at 2:26 p.m. "$32.26 ....and going VERTICAL!!!"

    ii.     February 28, 2014: "Today #MYBIGCOIN (MBC)
       Current value is $47.56 USD."

    iii.     March 15, 2014: "...Current value is $57.99 USD"

    iv.     April 19, 2014: "...Current value is $76.57 USD"

    v.     May 21, 2014: "...Current value is $102.13 USD"

    vi.     September 7, 2014: "...Current value is $111.66 USD"

    vii.     November 8, 2014: "...Current value is $121.38 USD"

**B.     Usage**

    i.     March 7, 2014: "...Sign up today to receive your My Big Coin
       Visa/MasterCard."

      ii.      September 3, 2015: "The First Crypto-Currency Mastercard easy access to your money use at any atm's and anywhere Mastercard is accepted."

**C.**    **Gold Backing**

      i.      March 6, 2014: "The Wait is Over !! Officially... My Big Coin has Entered into a Contract where All My Big Coins will be Backed 100% by Gold. My Big Coin. www.MyBigCoin.com."

      ii.      March 7, 2014: "The only crypto currency to back your money with gold."

      iii.     August 6, 2015: "The first Crypto Currency to be backed by Gold."

35.    These and similar statements about MBC's value or price, usage, and backing by gold were false and misleading representations and omitted material facts.

36.    Defendants also made false and misleading representations and omitted material facts to potential and existing MBC Customers from at least January 2014 through at least June 2017 through Internet chat room posts, with false statements regarding the rising trading price such as the following on the Internet chatroom, Raging Bull, http://ragingbull.com:

> February 10, 2014: "my friends and family are all in 'My Big Coin'– we all got in around 20.00 – its now at 32.26 . . . this will go through the roof – I encourage all to give it a look!"

This Internet chat room post was made on the same day and quoted the same price that Gillespie also posted on the MBC Facebook page.

37.    From at least January 2014 through at least June 2017, such Internet chat room solicitations touting MBC's supposed rising trading value or price, usage, and gold backing were publicly available.

38.    Defendants also made false and misleading representations and omitted material facts directly to MBC Customers from at least January 2014 through at least June 2017 in person and via email messages.

39.     Typically, these false and misleading representations and omissions also related to actions which could cause an increase in the trading value of MBC, how a customer could use MBC, and the safety of purchasing MBC because it was backed by gold.

40.     For example, in or around March 2016, Gillespie sent an email to a customer who was dissatisfied with his MBC purchase that included several material false statements regarding MBCP and MBC.  Gillespie wrote:

> Our funding (in the hundreds of millions) I'm told should hit this week...by the end of the week MBC[P] will buy up any and all coin you want to sell on the Exchange..."
>
> Things could not possibly be better—Randall [Crater] is in an unnamed South American country since yesterday, at their request, striking a deal to use our gold-backed coin to stabilize their economy.
>
> We have signed deal, 50/50 partnership with one of the largest companies in the world on their phone payment system.

These statements were false.

41.     Gillespie told another MBC customer "that all good with MBC... VERY good in fact. Each coin is now backed with gold!  So, our currency and accounts are backed better than the FDIC backs your money in the bank!"  These statements were false.

42.     Like Gillespie, from at least January 2014 through at least June 2017 Defendant Crater also made false representations to an MBC Customer about MBC being backed by hundreds of millions of dollars of gold.

43.     On January 28, 2015, Crater sent an email to the same MBC Customer which read "...we have 300 million in gold backing us they have nothing show [sic] you how strong we are going to be [.]"  This statement was false.

**44.** Defendants made these false and misleading representations and omitted material facts to potential as well as existing MBC Customers on the MBC and MBC Exchange websites, on Internet social media and chatroom websites, in email communications, and in person, and did so knowingly or with reckless disregard for the truth. Over the course of this scheme, Defendants have revised their fraudulent statements on the MBC website.

**B.     Defendants Misappropriated MBC Customers' Funds**

**45.** From at least January 2014 through at least June 2017, Defendants received in excess of approximately $6 million from at least twenty-eight MBC Customers.

**46.** From at least January 2014 through at least June 2017, Defendants misappropriated almost all of these MBC Customers' funds for improper and unauthorized uses, such as to wrongfully enrich themselves and the Relief Defendants.

**47.** From at least January 2014 through at least June 2017, Defendants directed MBC Customers to transfer funds into bank accounts controlled by or operated for the benefit of Defendants and Relief Defendants.

**48.** For instance, Defendants instructed MBC Customers to transfer funds by wire or through written checks into bank accounts held in the names of Relief Defendants Greyshore Advertisement, Greyshore LLC, Greyshore Technology, Barbara Crater Meeks, and Defendant Gillespie.

**49.** Upon receipt or very soon after receipt of MBC Customers' funds, the MBC Customer funds were transferred to other accounts controlled by Defendants or Relief Defendant Erica Crater, or withdrawn to make purchases for Defendants' or Relief Defendants' own financial benefit. On occasion, MBC Customer funds were transferred illegally to other MBC Customers to cover up Defendants' fraud.

13

50.    For example, MBC Customer funds for the purchase of MBC were transferred to a bank account in the name of "Kimberly Renee Benge d/b/a Greyshore Advertisemet a/k/a Greyshore Advertiset." On September 12, 2014, Relief Defendant Kimberly Benge withdrew funds from this account and purchased a cashier's check made out to "Kimberly Benges Greyshore Advertisment" in the amount of $1,849,370.38. The next business day, September 15, 2014, this cashier's check was deposited into a bank account held in the name of Greyshore LLC. On September 19, 2014, Defendants and/or Relief Defendants wired $631,523.79 from the Greyshore LLC bank account to a real estate settlement company in Florida with the notation "Other Home Purchase." On or about September 26, 2014, Relief Defendant Erica Crater purchased a home for the price of approximately $645,000 using the funds transferred to the real estate settlement company. A similar pattern repeated itself throughout the period from at least January 2014 through at least June 2017 with MBC customer funds being wired to Crater's or Erica Crater's personal bank accounts from Relief Defendants' bank accounts or used to make purchases in the amount of at least $339,689 at a jewelry store in Southampton, New York; at least $209,000 at an East Coast based marina; and at least $517,719.27 at an auction house that specialized in fine art and antiques in Southhampton, New York. Defendants and/or Relief Defendants withdrew via ATM transactions over $56,000 of MBC Customer funds from the Relief Defendant Greyshore Advertisement's bank account, and Relief Defendant Kimberly Benge personally withdrew at least $489,000 from this account at bank branch offices. None of the funds obtained from MBC Customers were used to buy MBC for MBC Customers.

51.    To the extent any MBC customers received any funds from the Defendants, those funds in fact consisted of funds that Defendants misappropriated from other MBC Customers, in the nature of a Ponzi scheme.

### C.   Crater Was a Controlling Person of MBCP

**52.** Crater was a controlling person of MBCP. Crater was a founder of MBCP and the creator/developer of MBC. Crater controlled the content on the MBC, MBC Exchange, and the MBC Mall websites, including setting the purported trading price of MBC. Crater either directly or indirectly controlled the operation of the bank accounts to which MBC Customers transferred funds under the belief that they were purchasing MBC.

### D.   Crater Acted as an Agent for MBCP

**53.** Through his solicitation of potential and existing MBC Customers and active marketing of MBC including, without limitation, providing information regarding the merits of owning MBC to potential and existing MBC Customers and providing existing customers with additional MBC after they raised concerns about their inability to trade MBC, Crater acted as an agent of MBCP.

### E.   Gillespie Acted as an Agent for MBCP

**54.** Through his actions in marketing and soliciting customers, through direct communications and posting on social media, and directing MBC Customers to transfer funds which they believed were for the purchase of MBC to bank accounts controlled by Defendants, Gillespie acted as an agent of MBCP.

### F.   Relief Defendants Received Funds to Which They Have No Legitimate Claim

**55.** As described above, on multiple occasions, Relief Defendants have received MBC Customer funds that were obtained as a result of Defendants' fraudulent conduct. Relief Defendants have no legitimate interest in the MBC Customer funds that they obtained or received. The funds funneled to the Relief Defendants exceeded $6 million.

## VII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Fraud by Deceptive Device or Contrivance

### Violations of Section 6(c)(1) of the Act and
### Regulation 180.1(a) by MBCP, Crater, and Gillespie

56.     Paragraphs 1 through 55 are re-alleged and incorporated herein by reference.

57.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any

person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any
> swap, or a contract of sale of any commodity in interstate
> commerce, or for future delivery on or subject to the rules of any
> registered entity, any manipulative or deceptive device or
> contrivance, in contravention of such rules and regulations as the
> Commission shall promulgate by not later than 1 year after [July
> 21, 2010, the date of enactment of the Dodd-Frank Wall Street
> Reform and Consumer Protection Act] . . . .

58.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides:

> It shall be unlawful for any person, directly or indirectly, in
> connection with any swap, or contract of sale of any commodity in
> interstate commerce, or contract for future delivery on or subject to
> the rules of any registered entity, to intentionally or recklessly:
> (1) Use or employ, or attempt to use or employ, any manipulative
> device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement
> of a material fact or to omit to state a material fact necessary in
> order to make the statements made not untrue or misleading;
> (3) Engage, or attempt to engage, in any act, practice, or course of
> business, which operates or would operate as a fraud or deceit
> upon any person . . . .

59.     Virtual currencies are encompassed in the definition of "commodity" under

Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).

60.     As described above, Defendants violated Section 6(c)(1) of the Act and

Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities

in interstate commerce, making or attempting to make untrue or misleading statements of

material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading, including without limitation, the following:

A.     Issuing written statements misrepresenting that MBC was actively being traded on several currency exchanges, including the MBC Exchange;

B.     Verbally telling MBC Customers that MBC would be listed on a new exchange when trading on the MBC Exchange was unsuccessful;

C.     Issuing written statements misrepresenting the daily trading price of MBC;

D.     Issuing written statements misrepresenting that MBC was backed by gold;

E.     Issuing written statements misrepresenting that MBC could be purchased, sold, traded, donated, and used to make purchases;

F.     Issuing written statements misrepresenting that MBC was a global currency that allowed customers to send money anywhere at any time in any currency;

G.     Issuing written statements misrepresenting that MBC could be used anywhere that MasterCard was accepted;

H.     Issuing written statements misrepresenting that MBCP was affiliated or had a relationship with the credit card companies Visa, MasterCard, American Express, and/or Discover;

I.     Issuing written statements misrepresenting that MBC could be used at the "MBC Mall" to purchase products;

J.     Issuing written statements mispresenting that customers owned a certain number of MBC and that MBC could be sold or customers could withdraw their funds; and

K.     Failing to disclose, and omitting, that Defendants were misappropriating MBC customer funds.

61.     As described above, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in connection with contracts of sale of a commodity in interstate commerce, soliciting customers with false and misleading statements about MBC's trading activity, usage, value, affiliation with credit card companies, and backing by gold; providing MBC Customers with false statements misrepresenting that customers owned a certain

17

number of MBC and that MBC could be sold or customers could withdraw their funds; and misappropriating MBC Customers' funds.

**62.** Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

**63.** By this conduct, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a).

**64.** The acts, omissions, and failures of Crater described in this Complaint occurred within the scope of his agency, employment, or office at MBCP. Accordingly, MBCP is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), as a principal for its agent's acts, omissions, or failures in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

**65.** At all times relevant to this Complaint, Crater controlled MBCP, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, MBCP's conduct constituting the violations of MBCP described in this Count. Accordingly, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Crater is liable for MBCP's violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

**66.** The acts, omissions, and failures of Gillespie described in this Complaint occurred within the scope of his agency, employment, or office at MBCP. Accordingly, MBCP is liable under Section 2(a)(1)(B) of the Act and Regulation 1.2 as principal for its agent's acts, omissions, or failures in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

**67.** Each act of (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the

statements not untrue or misleading; and (3) engaging, or attempting to engage, in a fraudulent or deceitful act, practice, or a course of business, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

### Count II – Disgorgement of Funds from Relief Defendants

**68.**     The allegations set forth in paragraphs 1 through 67 are re-alleged and incorporated herein by reference.

**69.**     Defendants have engaged in a fraudulent investment scheme that defrauded Defendants' customers.

**70.**     Relief Defendants have received funds that were obtained as a result of Defendants' fraudulent conduct.

**71.**     Relief Defendants have no legitimate entitlement to, or interest in, the funds received from Defendants' fraudulent conduct.

**72.**     Relief Defendants should be required to disgorge the funds they received from Defendants' fraudulent conduct, or the value of those funds that Relief Defendants may have subsequently transferred to third parties.

**72.**     By reason of the foregoing, Relief Defendants hold funds in constructive trust for the benefit of customers who were victimized by Defendants' fraudulent scheme.

### VIII.   RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

**A.**     An order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2012);

19

**B.** An order of permanent injunction enjoining each Defendant and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with any Defendant, including any successor thereof, from:

     **i.** Engaging, directly or indirectly, in conduct in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), or Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017);

     **ii.** Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

     **iii.** Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for their own personal account(s) or for any account in which Defendants have a direct or indirect interest;

     **iv.** Having any commodity interests traded on Defendants' behalf;

     **v.** Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

     **vi.** Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

     **vii.** Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except

as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

**viii.**     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration, or required to be registered with the Commission (except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017));

**C.**     An order directing each Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act and Regulations, as described herein;

**D.**     An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

**E.**     An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds any Defendant received, or caused another person or entity to receive, as a result of

21

the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

      **F.**      An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

      **G.**      An order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least January 2014 to the date of such accounting;

      **H.**      An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012);

      **I.**      An order requiring Relief Defendants, as well as any of their successors or assigns, to disgorge to any officer appointed or directed by the Court, all ill-gotten gains and other benefits received from Defendants, including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from Defendants as a result of Defendants' acts or practices that constitute violations of the Act and the Regulations, including post-judgment interest; and

      **J.**      An order providing such other and further relief as the Court deems proper.

*    *    *

Dated: January 16, 2018

**COMMODITY FUTURES TRADING COMMISSION**

By: _____

Traci L. Rodriguez
Chief Trial Attorney
trodriguez@cftc.gov

Jonah E. McCarthy
Trial Attorney
jmccarthy@cftc.gov

John Einstman
Chief Trial Attorney
jeinstman@cftc.gov

Paul G. Hayeck
Deputy Director (Mass. Bar. No. 554815)
phayeck@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, D.C. 20581
Phone: (202) 418-5980
Fax: (202) 418-5428

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION