UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>My Big Coin Pay, Inc., Randall Crater, and Mark Gillespie,<br><br>Defendants,<br><br>Kimberly Renee Benge, Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset, Barbara Crater Meeks, Erica Crater, Greyshore, LLC, Greyshore Technology, LLC,<br><br>Relief Defendants. | Case No.<br><br>**Filed Under Seal** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

I. SUMMARY ................................................................................................................1

II. THE PARTIES ...........................................................................................................2

   A. Defendants ........................................................................................................2

   B. Relief Defendants ............................................................................................2

      1. Crater's Family Members .......................................................................3

      2. Crater-Controlled Entities ......................................................................3

III. FACTS ......................................................................................................................3

   A. Defendants' Fraudulent Solicitation of Customers to Purchase MBC ...........4

   B. Defendants Misappropriated MBC Customer Funds ......................................7

IV. ARGUMENT ..........................................................................................................10

   A. The Court Has Jurisdiction and Authority to Grant the Relief Sought.........10

   B. The Evidence Justifies Issuance of the Proposed Ex Parte Order ................12

     1. Defendants Violated the Antifraud Provisions of Section 6(c)(1) of the Act and Regulation 180.1(a) .........................................................................................13

       a. Defendants Committed Fraud Through Misappropriation and Material Misrepresentations and Omissions .......................................................14

       b. In Connection with a Contract of Sale of a Commodity in Interstate Commerce.............................................................................................16

       c. Defendants Acted With Scienter ..........................................................17

     2. Crater is Liable as a Controlling Person ..............................................18

     3. MBCP is Liable for the Acts of its Agents Crater and Gillespie ...............19

V. CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*CFTC v. Baragosh,*
278 F.3d 319 (4th Cir. 2002)...................................................................................... 18

*CFTC v. Byrnes,*
58 F. Supp. 3d 319 (S.D.N.Y. 2014)........................................................................... 20

*CFTC v. Global Precious Metals Trading Co.,*
No. 1:13-cv-21708, 2013 WL 5212237 (S.D. Fla. Sept. 12, 2013) ........................... 14

*CFTC v. Hunter Wise Commodities, LLC,*
21 F. Supp. 3d 1317 (S.D. Fla. 2014) .................................................................. 14, 15

*CFTC v. Int'l Fin. Servs. (N.Y), Inc.,*
323 F. Supp. 2d 482 (S.D.N.Y. 2004)................................................................... 15, 18

*CFTC v. Kraft Foods Grp., Inc.,*
153 F. Supp. 3d 996 (N.D. Ill. 2015) .................................................................... 14, 17

*CFTC v. Levy,*
541 F.3d 1102 (11th Cir. 2008)................................................................................... 12

*CFTC v. Muller,*
570 F.2d 1296 (5th Cir. 1978)............................................................................... 11, 12

*CFTC v. Morgan, Harris & Scott, Ltd.,*
484 F. Supp. 669 (S.D.N.Y. 1979).............................................................................. 13

*CFTC v. R.J. Fitzgerald & Co., Inc.,*
310 F.3d 1321 (11th Cir. 2002)............................................................................ 15, 17

*CFTC v. S. Trust Metals, Inc.,*
No. 1:14-CV-22739-KING, 2016 WL 4523851 (S.D. Fla. Aug. 29, 2016) ............... 15

*CFTC v. Weinberg,*
287 F. Supp. 2d 1100 (C.D. Cal. 2003) ...................................................................... 15

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
370 F.3d 151 (1st Cir. 2004)....................................................................................... 12

*First Commodity Corp. v. CFTC,*
  676 F.2d 1 (1st Cir. 1982) ........................................................................................ 17

*Guttman v. CFTC,*
  197 F.3d 33 (2nd Cir. 1999) ..................................................................................... 19

*In re BFXNA Inc.,*
  CFCT No. 16-19, 2016 WL 313612 (June 2, 2016) ................................................. 17

*In re Coinflip, Inc.,*
  CFTC No. 15-29, 2015 WL 553736 (Sept. 17, 2015) .............................................. 17

*In re Commodities Int'l Corp.,*
  CFTC No. 83-43, 1997 WL 11543 (Jan. 14, 1997) .................................................. 15

*In re J.P. Jeanneret Assocs., Inc.,*
  769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................................................................... 16

*In re Spiegel,*
  CFTC No. 85-19, 1988 WL 232212 (Jan. 12, 1988) ................................................ 19

*In re TeraExchange LLC,*
  CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015) ............................................ 17

*Monieson v. CFTC,*
  996 F.2d 852 (7th Cir. 1993) .................................................................................... 18

*SEC v. DiBella,*
  No. 304CV1342EBB, 2005 WL 3215899 (D. Conn. Nov. 29. 2005) ...................... 16

*SEC v. Fife,*
  311 F.3d 1 (1st Cir. 2002) ......................................................................................... 12

*SEC v. Hasho,*
  784 F. Supp. 1059 (S.D.N.Y 1992) .......................................................................... 16

*SEC v. Lawbaugh,*
  359 F. Supp. 2d 418 (D. Md. 2005) .......................................................................... 15

*SEC v. Lucent Techs., Inc.,*
  610 F. Supp. 2d 342 (D.N.J. 2009) ........................................................................... 14

*SEC v. Thibeault,*
  80 F. Supp. 3d 288 (D. Mass. 2015) ......................................................................... 12

*SEC v, Zandford,*
  535 U.S. 813 (2002) .................................................................................................. 16, 17

*Stotler & Co. v. CFTC,*
  855 F.2d 1288 (7th Cir. 1988) ......................................................................................... 19

**STATUTES**

7 U.S.C. § 1a(9) (2012) .................................................................................................. 17

7 U.S.C. § 1a(13) (2012) ................................................................................................ 17

7 U.S.C. § 2 (2012) ........................................................................................................ 19

7 U.S.C. § 9 (2012) ..................................................................................................... 2, 10

7 U.S.C. § 13a-1 (2012) .......................................................................................... 1, 10, 11

7 U.S.C. § 13c (2012) .................................................................................................... 18

**REGULATIONS**

17 C.F.R. § 1.2 (2017) .................................................................................................... 19

17 C.F.R. § 180.1 (2017) ................................................................................... 2, 10, 13, 17

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive
  Devices and Prohibition on Price Manipulation,
  76 Fed. Reg. 41,398 (July 14, 2011) ............................................................................. 14, 16

**LEGISLATIVE HISTORY**

H.R. REP. NO. 97-565 (1982), reprinted in 1982 U.S.C.C.A.N. 3871 ........................................ 11

Plaintiff Commodity Futures Trading Commission ("Commission") submits this Memorandum in Support of Plaintiff's *Ex Parte* Motion for a Temporary Restraining Order against defendants Randall Crater ("Crater"), Mark Gillespie ("Gillespie"), and the company My Big Coin Pay, Inc. ("MBCP") (collectively, "Defendants"); and relief defendants Kimberly Renee Benge, Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset, Barbara Crater Meeks, Erica Crater, Greyshore, LLC, and Greyshore Technology, LLC (collectively, "Relief Defendants"), pursuant to Section 6c of the Commodity Exchange Act, ("Act") 7 U.S.C. § 13a-1 (2012), and in accordance with Rule 65 of the Federal Rules of Civil Procedure.

## I.    SUMMARY

Since at least January 2014 through the present, Defendants engaged in a deceptive virtual currency scheme in which they fraudulently offered the sale of a fully-functioning virtual currency, My Big Coin ("MBC"), a commodity in interstate commerce. From at least January 2014 through at least June 2017, Defendants obtained more than approximately $6 million from at least twenty-eight customers ("MBC Customers") through fraudulent solicitations. Capitalizing on the public's heightened awareness of, and interest in purchasing, virtual currencies, Defendants fraudulently offered for sale MBC, a virtual currency with a similar sounding name to the popular virtual currency Bitcoin. To entice people to purchase MBC, Defendants repeatedly made false and misleading claims and omissions about MBC's value, usage, trade status, and financial backing. Contrary to their claims, Defendants misappropriated almost all of the more than approximately $6 million they obtained from MBC Customers and used the misappropriated money to fund lavish lifestyles, including purchasing a home, antiques, high-end cars, fine art, jewelry, and other luxury items.

As shown below and alleged in the Commission's contemporaneously filed Complaint For Injunctive and Other Equitable Relief and For Civil Monetary Penalties Under the Commodity Exchange Act and Commission Regulations ("Complaint"), Defendants have engaged, are engaging, and may be about to engage in acts and practices that constitute violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. § 180.1(a) (2017). Accordingly, the Commission moves for a temporary restraining order to enable the Court to grant full and effective relief by preserving the status quo, in particular by (1) freezing Defendants' and Relief Defendants' assets by prohibiting them from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property; and (2) prohibiting Defendants and Relief Defendants from destroying, altering or disposing of any books and records or other documents.

## II.    THE PARTIES

### A.    Defendants

MBCP is a Nevada corporation that was incorporated on October 9, 2014. Exhibit 1, Declaration of Patricia Gomersall ¶ 4 ("Gomersall Decl."). MBCP's last known address is 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169. *Id.* Crater is a founder of MBCP and is a resident of East Hampton, New York. *Id.* at ¶ 5. Gillespie solicited customers on behalf of MBCP and Crater, and is a resident of Harland, Michigan. *Id.* at ¶ 6. No Defendants have ever been registered with the Commission. *Id.* at ¶ 13.

### B.    Relief Defendants

As shown below and alleged in the Complaint, during their fraudulent scheme, Defendants funneled customer funds or arranged for customers to send their funds to accounts in the name of or associated with three of Crater's family members and two businesses Crater operated. *Id.* at ¶¶ 36-42. These individuals and entities named in the Complaint as Relief

Defendants have no legitimate claim to the customer funds they hold, or they have collected, all of which were obtained as a result of Defendants' fraudulent conduct.

### 1. Crater's Family Members

Relief Defendant Kimberly Renee Benge is Crater's sister and is a resident of State Road, North Carolina. *Id*. at ¶ 7. Relief Defendant Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset ("Greyshore Advertisement") is operated by Benge and used addresses in State Road, North Carolina and East Hampton, New York. *Id*. at ¶ 8. Relief Defendant Barbara Crater Meeks is Crater's mother and a resident of Elkin, North Carolina. *Id*. at ¶ 9. Relief Defendant Erica Crater is Crater's wife and a resident of East Hampton, New York. *Id*. at ¶ 10.

### 2. Crater-Controlled Entities

Relief Defendant Greyshore, LLC ("Greyshore") is a limited liability company based in Longwood, Florida that was formed on May 17, 2010. *Id*. at ¶ 11. Greyshore used addresses of 280 South Ronald Reagan Boulevard, Suite 203, Longwood, Florida; and 81 Newtown Lane, Suite 328, East Hampton, New York. *Id*. Crater is a Managing Member of Greyshore. *Id*. Relief Defendant Greyshore Technology, LLC ("Greyshore Technology") is a business based in East Hampton, New York and its last known address is 81 Newtown Lane, Suite 328, East Hampton, New York. *Id*. at ¶ 12. Crater is the CEO of Greyshore Technology. *Id*. at ¶ 12.

No Relief Defendants have ever been registered with the Commission. *Id*. at ¶ 13.

### III. FACTS

From at least January 2014 to present, Defendants have engaged in a fraudulent virtual currency scheme. During their scheme, Defendants have fraudulently solicited customers to purchase MBC by repeatedly making false and misleading claims and omissions about MBC's value, usage, trade status, and financial backing. Through their fraudulent solicitations,

3

Defendants obtained more than approximately $6 million from at least twenty-eight customers. Contrary to their fraudulent claims, Defendants misappropriated nearly all customers' funds, using the money to enrich themselves and finance lavish lifestyles.

## A.      Defendants' Fraudulent Solicitation of Customers to Purchase MBC

From at least January 2014 to through at least June 2017, Defendants fraudulently solicited customers to buy MBC.[1]  In soliciting funds, Defendants made numerous material misrepresentations and omissions to potential customers about MBC's value, usage, trade status, and financial backing.  Defendants made these false and misleading representations and omissions of material facts to potential MBC Customers via email, MBC websites, YouTube videos, press releases, posting on social media platforms, such as Facebook and chatroom websites, and in person.  *See* Gomersall Decl. at ¶ 14.

In soliciting funds from MBC Customers, Defendants repeatedly made false statements about the price or value of MBC.  *Id.* at ¶¶ 17, 20, 25, 26.  For example, Defendants reported on MBC's website (www.mybigcoin.com) (the "MBC Website") the "current" or daily "value" of MBC, which supposedly fluctuated.  *Id.* at ¶¶ 15, 17.  The MBC Website remains publicly available today, but over time, Defendants have revised their statements on the website.  *Id.* at ¶ 15.  However, the value Defendants reported on the MBC Website (and elsewhere) was false and misleading because Defendants would simply arbitrarily change the price of MBC.  *Id.* at ¶ 31.  Defendants made similar false and misleading representations and omissions about the value of MBC on various social media platforms, such as Facebook.  *Id.* at ¶ 25.  For example, on January 27, 2014, Defendants posted the following on the MBC Facebook page: "Today

---

[1] Defendants also induced MBC Customers to purchase both shares of stock in a company that had merged with MBC and alleged licenses related to the medical marijuana business and marijuana derivative products such as Trokie, a marijuana-based lozenge. Gomersall Decl. at ¶ 14 n.6.

current value is $28.87 USD." *Id.* On February 10, 2014, Gillespie posted a comment to this post stating, "$32.26 ....and going VERTICAL!!!" *Id.* The MBC Facebook page remains active today and contains multiple false representations about MBC's purported use, value, price, and gold-backing.

Similarly, Defendants lied about MBC's usage when soliciting funds from MBC Customers. *Id.* at ¶¶ 16, 19, 20, 21, 25. For example, on August 15, 2015, Defendants posted a YouTube video online in which they claimed that MBC could be purchased, sold, traded, donated, and used to make purchases. *Id.* at ¶¶ 21, 22. Currently, this YouTube video has over 18,700 views and is available for viewing today. *Id.* at ¶ 21. Defendants made similar false and misleading representations about MBC on the My Big Coin Mall website (www.bigcoinmall.com), which advertised that MBC Customers could purchase any products shown on the website, which included Apple and Sony electronics, using MBC. *Id.* at ¶ 19. The MBC Mall website remains publicly available today. *Id.* In addition to representations on the My Big Coin Mall website, Defendants also falsely represented to customers that MBC could be traded through the separate My Big Coin Exchange website (www.mybigcoinexchange.com), which displayed purported trades in MBC, including buy and sell orders along with the volume and price of the trades. *Id.* at ¶ 20. As of January 10, 2018, the MBC Exchange website displayed purported trades in MBC.[2] These statements were false. MBC Customers could not exercise any ownership rights in relation to their MBC because they could not trade their MBC or withdraw funds from their individual accounts.

In their solicitations to customers, Defendants also lied about a partnership with MasterCard. *Id.* at ¶¶ 16, 22, 23. For example, in the YouTube video described above,

---

[2] As of January 11, 2018, however, the only page displayed on the MBC Exchange website states that the domain name has expired. *Id.* at ¶ 20.

Defendants stated that MBC had partnered with MasterCard with the promise that MBC could be used anywhere MasterCard was accepted. *Id*. at ¶ at 22. Defendants made a similar representation on the MBC Facebook page, stating that MBC was the "[f]irst Crypto-Currency Mastercard [sic] easy access to your money use at any atms's and anywhere Mastercard [sic] is accepted"). *Id*. at ¶ at 25. In addition, Defendants touted a purported agreement with MasterCard in a November 4, 2014 press release, stating that they had "reached an agreement with TRUCASH aka DCR Strategies Inc. ... for the implementation of a customized branded pre-paid master card [sic] program." *Id*. at ¶ 23. These statements were false, and Defendants knew they were false or recklessly disregarded the truth of the statements at the time because no such agreement with TRUCASH or MasterCard was in place. *Id*. at ¶ 24.

In addition, on numerous occasions, Defendants lied about the financial backing of MBC in their solicitations to existing and prospective MBC Customers. *Id*. at ¶¶ 21, 25, 28, 29, 30, 33, 34. Specifically, Defendants misrepresented that MBC was backed by gold, when in fact it was not. For example, Defendants stated in an August 6, 2015 post on the MBC Facebook page, "The first Crypto Currency to be backed by Gold." *Id*. at ¶ 25. Defendants repeated the same lie that MBC was backed by gold in other Facebook posts and the YouTube video described above. *See, e.g., id*. at ¶¶ 22, 25. As noted above, the YouTube video and Facebook posts remain available online today. Defendants Crater and Gillespie also made false and misleading representations about MBC being backed by gold directly to MBC Customers in person and via email. *Id*. at ¶¶ 28, 29, 30, 33, and 34. For example, Crater told one MBC customer ("Customer A"), who lives in Boston, Massachusetts, that MBC was backed by gold and "further backed up by an oil deposit ...[and] some sort of insurance...." *Id*. at ¶ 34. Crater and Gillespie made similar false statements to MBC Customers via email. For example, on or about January 28,

6

2015, Crater sent an email to Customer A stating that the company had "300 million in gold backing us[.]" *Id.* at ¶ 33. On or about March 4, 2016, Gillespie sent an email to another MBC customer stating that Crater was in an "unnamed South American country since yesterday, at their request, striking a deal to use our gold- backed coin to stabilize their economy." *Id.* at ¶ 30.

## B.    Defendants Misappropriated MBC Customer Funds

From at least January 2014 through at least June 2017, Defendants received more than approximately $6 million from at least twenty-eight MBC Customers. *Id.* at ¶ 36. Rather than have MBC Customers send money to a bank account controlled by MBCP, Defendants funneled MBC Customer Funds or arranged for MBC Customers to send their funds to multiple bank accounts controlled by or operated for the benefit of Defendants and Relief Defendants. *Id.*

MBC Customer funds were received into a Wells Fargo bank account in the name of Relief Defendant Greyshore Advertisement (the "Greyshore Advertisement Account"). *Id.* at ¶¶ 37-38. Although the account opening documents for this account state that Relief Defendant Benge, Crater's sister, is the only authorized signatory, counsel for Benge represented in writing to counsel for the Commission that Crater directed Benge to open the account under the name Greyshore Advertisement, and that Crater was an authorized signer and had the only debit card and checkbook for the account. *Id.* at ¶ 37. MBC Customer funds were also funneled or received into a Bank of America account in the name of Relief Defendant Greyshore LLC (the "Greyshore Account"). *Id.* at ¶¶ 39-40. The account opening documents for this account show that Crater and Benge are authorized signers. *Id.* at ¶ 39. Notably, this account was opened and began receiving MBC Customer funds within one week of the closing of the Greyshore Advertisement Account. *Id.* at ¶¶ 37-40. Additionally, MBC Customer funds were received into a BB&T account in the name of Relief Defendant Meeks (the "Meeks Account"). *Id.* at ¶¶ 41-42.

Contrary to their representations to MBC Customers that the money was for the purchase of MBC, Defendants misappropriated the funds they received from customers. *Id.* at ¶ 43. In fact, almost all of the more than approximately $6 million that Defendants received from MBC Customers was transferred to other accounts controlled directly or indirectly by Defendant Crater and then transferred to other accounts controlled by Crater or Relief Defendant Erica Crater, or withdrawn to make purchases for Crater's or Relief Defendants' own financial benefit. *Id.*

For example, MBC Customer funds in the Greyshore Account were used to pay personal expenses such as: (1) over $195,000 on purchases at a jewelry store and auction house; (2) over $117,000 in ATM and cash withdrawals; and (3) over $65,000 on credit card bills. *Id.* at ¶ 48. An additional $172,000 in MBC Customer funds was funneled directly to Crater via cash transfers and checks. *Id.* at ¶ 49. Also, approximately $1 million of MBC Customer funds from the Greyshore Account were used to purchase, remodel, furnish, and landscape a home in Florida. *Id.* at ¶ 50.

Similarly, funds from the Meeks Account, which had received MBC Customer money, were funneled to Crater and Relief Defendant Erica Crater. *Id.* at ¶ 51. For example, between February 4, 2015, and the present, approximately $239,300 was funneled to Crater's personal account at BB&T Bank. *Id.* at ¶¶ 52-53. And between November 2015 and the present, approximately $179,000 was funneled to Relief Defendant Erica Crater's personal account at Capital One Bank. *Id.* at ¶¶ 54-55.

Additionally, MBC Customer funds in the Greyshore Advertisement Account were used to pay personal expenses such as: (1) over $490,000 taken out in cash withdrawals; (2) over $850,000 on purchases at a jewelry exchange and auction house; and (3) over $130,000 on utilities, clothing, auto expenses, restaurants, pet supplies, and online retail purchases. *Id.* at

¶ 44. Further, approximately $1,185,900 was funneled from the Greyshore Advertisement Account to Crater's personal account at Bank of America. *Id.* at ¶ 45.

Crater spent the money funneled into his Bank of America account on luxury items including:

- $94,188 at a jewelry store in Southampton, New York;

- $55,300 at a jeweler in Southampton, New York;

- $32,206 at a luxury handbag store in Southampton, New York;

- $79,938 at an auction house in Southampton, New York;

- $80,000 at a car dealer in Greensboro, NC;

- $47,612 at a Mercedes Benz dealer in Southampton, NY;

- $57,905 at a Mercedes Benz dealer in Huntington, NY;

- $63,574 at a car dealer in Myrtle Beach, SC;

- $121,872 at a luxury car dealer in Charleston, SC; and

- $56,539 at a car dealer in Myrtle Beach, SC. *Id.* at ¶ 56.

In addition, although the Commission does not yet have complete information about Crater's personal bank accounts, Crater appears to be liquidating assets previously purchased with MBC Customer funds. *Id.* at ¶ 57. For example, between April 2015 and August 2017, the Commission found the following deposits into Crater's personal account at BB&T:

- $86,410 from a car dealer in New York;

- $133,500 from a private individual, with a notation on the wire "purchase of a 2014 Porsche";

- $100,000 from a used auto dealer in Florida;

- $60,451 from a Land Rover dealer in Long Island, NY;

- $21,879 from a car dealer in Myrtle Beach, FL;

- $31,500 from a jeweler;

- $36,972 from a jewelry store in Southampton, NY;

- $33,000 from an auction house in Tallahassee, FL; and

- $3,115 from an auction house in in New York. *Id.*

## IV.    ARGUMENT

As described above and in the Complaint, Defendants have repeatedly violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017). Defendants have already fraudulently solicited more than approximately $6 million from members of the public, and there is a reasonable likelihood that Defendants are continuing their fraud. The Commission's request for emergency injunctive relief is necessary to preserve the status quo by freezing Defendants' and Relief Defendants' assets and preserving Defendants' and Relief Defendants' books and records.

### A.    The Court Has Jurisdiction and Authority to Grant the Relief Sought

Section 6c of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive and other relief in a federal district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

In accordance with FRCP 65, Section 6c(a) and (b) of the Act empowers the Court to grant restraining orders without bond – and on an *ex parte* basis – to freeze assets and prohibit any person from destroying records or denying Commission officials access thereto whenever it appears that any person has engaged, is engaging, or is about to engage in any act or practice

10

constituting a violation of the Act or Regulations.[3] Mindful that notice "may result in the destruction of books and records and the dissipation of customer funds," Congress authorized courts to issue such relief *ex parte* in order "to prevent possible removal or destruction of potential evidence or other impediments to legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and other property which may be subject to lawful claims of customers." H.R. REP. NO. 97-565, at 53-54, 93 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3902-03, 3942.

The limited temporary restraining order the Commission seeks, which freezes Defendants' and Relief Defendants' assets and preserves Defendants' and Relief Defendants' books and records, fits squarely within the Court's authority under Section 6c(a) of the Act. *See CFTC v. Muller*, 570 F.2d 1296, 1301 (5th Cir. 1978) (in an opinion concerning a preliminary injunction, the "temporary freeze of defendant's assets was reasonably necessary to assure that the court's jurisdiction would not be defeated by the defendant's disposition of assets in the event the court should ultimately order disgorgement of the allegedly misappropriated funds."). Further, an asset freeze is especially appropriate where, as here, the Commission seeks

---

[3] Section 6c(a) of the Act provides, in pertinent part, that the Commission may bring an action to enjoin violations of the Act or Regulations and that:

> no restraining order (other than a restraining order which prohibits
> any person from destroying, altering or disposing of, or refusing to
> permit authorized representatives of the Commission to inspect,
> when as requested, any books and records or other documents or
> which prohibits any person from withdrawing, transferring,
> removing, dissipating, or disposing of any funds, assets, or other
> property ...) or injunction for violation of the provisions of [the
> Act] shall be issued *ex parte* by said Court.

Section 6c(b) of the Act states that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."

disgorgement and restitution. *See CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008) ("[A] district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy."); *SEC v. Thibeault*, 80 F. Supp. 3d 288, 293-94 (D. Mass. 2015) ("[A]n asset freeze is justified in equity when the likelihood of a significant violation has been shown and it is unlikely there will be sufficient funds to pay a disgorgement remedy or a civil penalty in the event a violation is established at trial.").[4]

**B.     The Evidence Justifies Issuance of the Proposed Ex Parte Order**

The entry of a temporary order freezing assets and preventing destruction of records is critical in this case. Defendants have already misappropriated more than approximately $6 million from MBC Customers, and Crater has already liquidated some of the personal luxury items he purchased with MBC Customer funds. *See* Gomersall Decl. at ¶¶ 36, 43-57. Given the extent of their fraud and that Defendants and Relief Defendants remain in possession of the fruits of their fraud, court action is required to stop Defendants and Relief Defendants from further dissipating funds and to ensure they do not defeat the Court's ability to order disgorgement. *See Muller*, 570 F.2d at 1300-01. Similarly, the ease of destroying documents supports an order prohibiting Defendants and Relief Defendants from destroying records. Preservation of such records will provide a meaningful opportunity to identify other potential victims of Defendants'

---

[4] The Commission is aware that in deciding whether to issue a temporary restraining order and a preliminary injunction, courts in the First Circuit apply the same standard and rely on four factors: (i) the likelihood of success on the merits; (ii) the potential for irreparable harm if the injunction is denied; (iii) the balance of harm suffered by the movant if the injunction is denied weighed against that suffered by the nonmovant if the injunction is granted; and (iv) the public interest. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002). Regardless of the test applied, however, as shown herein the evidence justifies the issuance of the extremely limited temporary restraining order the Commission seeks that is squarely within the authority set forth under Section 6c(a) of the Act in this case.

fraud and to identify and account for all of Defendants' and Relief Defendants' assets. *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 678 (S.D.N.Y. 1979).

**1.    Defendants Violated the Antifraud Provisions of Section 6(c)(1) of the Act and Regulation 180.1(a)**

Section 6(c)(1) of the Act makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] July 21, 2010 . . . .

Regulation 180.1(a) makes it "unlawful for any person, directly or indirectly, in connection with any ... contract of sale of any commodity in interstate commerce ... to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 180.1(a) (2017).

As the Commission has explained, the language of Section 6(c)(1) of the Act, "particularly the operative phrase 'manipulative or deceptive device or contrivance,' is virtually identical to the terms used in section 10(b) of the Securities Exchange Act of 1934 ('Exchange Act')," and given the similarities between Section 6(c)(1) of the Act and section 10(b) of the Exchange Act, "the Commission deems it appropriate and in the public interest to model final

13

Rule 180.1 on SEC Rule 10b-5." Prohibition on the Employment, or Attempted Employment, of

Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg.

41,398, 41,399 (July 14, 2011). Federal courts have likewise noted the similarities and found

case law developed under Section 10(b) and Rule 10b-5 to be instructive in construing

Section 6(c)(1) of the Act and Regulation 180.1(a). *See, e.g., CFTC v. Kraft Foods Grp., Inc.*,

153 F. Supp. 3d 996, 1008-09 (N.D. Ill. 2015); *CFTC v. Hunter Wise Commodities, LLC*, 21 F.

Supp. 3d 1317, 1346-47 (S.D. Fla. 2014).

To prove a violation of Section 6(c)(1) of the Act and Regulation 180.1(a), the

Commission must show that Defendants: (1) engaged in prohibited conduct (i.e., employed a

fraudulent scheme, made material misrepresentations, or engaged in a fraudulent business

practice); (2) in connection with the sale of a commodity in interstate commerce; (3) with

scienter. *See, e.g., Hunter Wise*, 21 F. Supp. 3d at 1347; *see also SEC v. Lucent Techs., Inc.*, 610

F. Supp. 2d 342, 349-50 (D.N.J. 2009) (discussing Rule 10b-5 requirements). As shown below,

Defendants repeatedly violated Section 6(c)(1) of the Act and Regulation 180.1 by intentionally

or recklessly engaging in a scheme to defraud customers in connection with the sale of a fully-

functioning virtual currency, MBC, a commodity in interstate commerce. Defendants made false

and misleading representations and omissions to solicit customers to purchase MBC, and then

misappropriated almost all of the money they received from customers.

### a. Defendants Committed Fraud Through Misappropriation and Material Misrepresentations and Omissions

Misappropriation of customer funds constitutes fraud that violates Section 6(c)(1) of the

Act and Regulation 180.1(a). *See CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-

21708, 2013 WL 5212237, at *5 (S.D. Fla. Sept. 12, 2013) (defendant violated Section 6(c)(1) of

the Act and Regulation 180.1(a)(1) by misappropriating funds and making misrepresentations

and omissions); *cf., e.g., SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 422 (D. Md. 2005) (defendant

violated Section 10(b) of the Exchange Act and Rule 10b-5 by misappropriating investor funds

for his personal benefit). Here, Defendants misappropriated virtually all of the more than

approximately $6 million they obtained from customers to purchase MBC in violation of Section

6(c)(1) of the Act and Regulation 180.1(a). *See* Gomersall Decl. at ¶ 36. *See, e.g., CFTC v.

Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003) (misappropriation of funds earmarked

for trading constituted "willful and blatant fraudulent activity that clearly violates" the Act)

(quotation marks and citations omitted).

Making material misrepresentations or omissions in connection with a contract of sale of

any commodity in interstate commerce violates Regulation 180.1(a). *See Hunter Wise*, 21 F.

Supp. 3d at 1347; *CFTC v. S. Trust Metals, Inc.*, No. 1:14-CV-22739-KING, 2016 WL 4523851,

at *5-6 (S.D. Fla. Aug. 29, 2016). A statement of fact is material "if a reasonable investor would

consider it important in deciding whether to make an investment." *CFTC v. R.J. Fitzgerald &

Co.*, 310 F.3d 1321, 1328-29 (11th Cir. 2002) (citation omitted). Any fact that enables investors

to assess the risk inherent in their investment and the likelihood of profit is material. *See In re

Commodities Int'l Corp.*, CFTC No. 83-43, 1997 WL 11543, at *8-9 (Jan. 14, 1997).

Misrepresentations concerning profit and risk go to the heart of a customer's investment decision

and are therefore material as a matter of law. *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp.

2d 482, 500-01 (S.D.N.Y. 2004).

Here, as shown above, Defendants' communications with MBC Customers were rife with

material misrepresentations and omissions in violation of Regulation 180.1(a). Defendants

repeatedly misrepresented the existence, potential uses, trading, and financial backing of MBC.

Gomersall Decl. at ¶¶ 16-35. For example, Defendants misrepresented that (1) customers owned

a certain number of MBC and could withdraw their funds; *id.* at ¶¶ 23, 25, 27; (2) MBC was

actively being traded on several currency exchanges, *id.* at ¶¶ 16, 20, 22; (3) MBC could be

purchased, sold, traded, donated, and used to make purchases, *id.* at ¶¶ 16, 19, 20, 22, 25;

(4) MBC was backed by gold, *id.* at ¶¶ 16, 21, 22, 25, 28, 29, 30, 33, 34; and (5) MBCP was

affiliated with MasterCard and other credit card companies, *id.* at ¶¶ 16, 21, 22, 23, 25. In

addition, Defendants omitted to state material facts, including omitting they were (1)

misappropriating MBC customer funds, *id.* at ¶ 36; and (2) arbitrarily setting the prices or value

of MBC reported on the MBC Website and Exchange, *id.* at ¶ 31.

### b. In Connection with a Contract of Sale of a Commodity in Interstate Commerce

The "in connection with" requirement of Section 6(c)(1) of the Act and

Regulation 180.1(a) is construed broadly and is satisfied where the contract of sale of a

commodity in interstate commerce and the fraud are not independent events. *See, e.g.*, *SEC v.

Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992); *SEC v. Zandford*, 535 U.S. 813, 819 (2002)

(holding that Section 10(b) of the Exchange Act "should be construed not technically and

restrictively, but flexibly to effectuate its remedial purposes"); *SEC v. DiBella*, No.

304CV1342EBB, 2005 WL 3215899, at *6 (D. Conn. Nov. 29, 2005) ("A fraudulent scheme that

coincides with the sale of securities satisfies the 'in connection with' requirement of section

10(b) [of the Exchange Act] and Rule 10b-5." (citing *Zandford*, 535 U.S. at 825)); *see also* 76

Fed. Reg. at 41,405 ("The Commission interprets the words 'in connection with' broadly, not

technically or restrictively."); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361-63

(S.D.N.Y. 2011) (concluding that the "in connection with" requirement can be met in cases

involving "completely fictitious" securities transactions). A "contract of sale" includes sales,

agreements of sale, and agreements to sell. 7 U.S.C. § 1a(13) (2012). Virtual currency, like

MBC, is a "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012). *See In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015); *In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082, at *3 (Sept. 24, 2015); *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, at *5 (June 2, 2016).

Here, Defendants' fraudulent scheme was "in connection with" contracts of sale of a virtual currency, MBC, a commodity in interstate commerce. Defendants fraudulently solicited customers for the purchase of MBC throughout the United States. Gomersall Decl. at ¶ 14. The material misrepresentations and omissions alleged in the Complaint and described above concerned the use, value, and financial backing of MBC. *Id.* at ¶¶ 16-35. Defendants made the misrepresentations and omissions about MBC through sources available to the public world-wide, including the MBC website, YouTube videos, and social media platforms. *Id.* at ¶ 14. In addition, Defendants actually obtained and then misappropriated more than approximately $6 million for the purpose of entering into contracts of sale of MBC. *Id.* at ¶¶ 36, 43.

### c.    Defendants Acted With Scienter

Under Regulation 180.1, the Commission must show that Defendants' conduct was intentional or reckless. 17 C.F.R. § 180.1 (2017); *Kraft*, 153 F. Supp. 3d at 1015. This standard is met if a defendant "intended to defraud, manipulate, or deceive, or if [d]efendant's conduct represents an extreme departure from the standards of ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328; *see also Kraft*, 153 F. Supp. 3d at 1015. The Commission can establish recklessness by showing that the conduct "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing." *First Commodity Corp. v. CFTC*, 676 F.2d 1, 7 (1st Cir. 1982); *see also R.J. Fitzgerald*, 310 F.3d at 1328 (holding that scienter is met when a defendant's conduct "involves highly unreasonable omissions or

misrepresentations that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it") (quotation omitted).

Here, Defendants conduct in misappropriating MBC Customer funds and making material misrepresentations and omissions about MBC was intentional or, at a minimum, reckless. For example, when Defendants solicited customers, they knew or should have known their representations that MBC could be purchased, sold, or traded and was backed by gold were false because no MBC had ever traded and MBC was not backed by any gold. Additionally, when Defendants issued statements to customers representing that their funds were used to buy a specific number of MBC, which could be sold or traded for an ever increasing amount of U.S. Dollars, Defendants knew those statements were false because MBC Customer funds were being transferred to other accounts controlled by Defendants or Relief Defendant Erica Crater, or withdrawn to make purchases for Defendants' or Relief Defendants' own financial benefit. Gomersall Decl. at ¶¶ 43-56. Accordingly, Defendants acted with the requisite scienter.

### 2. Crater is Liable as a Controlling Person

Under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), an individual who possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an entity may be liable as a controlling person of that entity, provided that the individual either knowingly induces, directly or indirectly, the violative acts, or fails to act in good faith. To establish controlling person liability under Section 13c(b) of the Act, the Commission must show: (1) control; and (2) lack of good faith or knowing inducement of the acts constituting the violation. *Int'l Fin. Servs.*, 323 F. Supp. 2d at 504 (quoting *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002)). The statute is to be construed liberally, and even indirect means of discipline or influence, short of actual direction, is sufficient to find liability as a controlling person. *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993). Proof of recklessness will

18

demonstrate that the controlling person acted in bad faith. *Id.* at 860. To establish "knowing inducement," the Commission must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *7 (Jan. 12, 1988).

Here, Crater is liable as a controlling person. First, Crater has general control over MBCP. Crater co-founded the company, created MBC, and controlled the content on the MBC, MBC Exchange, and the MBC Mall websites. Gomersall Decl. at ¶ 5. In addition, Crater either directly or indirectly controlled the bank accounts to which he directed MBC Customers to send money for the purchase of MBC. *Id.* at ¶¶ 11, 12, 36, 37. Crater also was responsible for developing and disseminating the false and misleading information about MBC to MBCP Customers through MBC's solicitation materials. *Id.* at ¶¶ 32-35. Second, Crater knowingly induced, directly or indirectly, the conduct constituting the violations set forth in the Complaint, or failed to act in good faith. In fact, Crater was personally involved in and took many of the fraudulent acts alleged in the Complaint. Accordingly, Crater is liable for MBCP's violations of Section 6(c)(1) of the Act and Regulation 180.1(a) to the same extent as MBCP itself.

### 3.     MBCP is Liable for the Acts of its Agents Crater and Gillespie

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), impose strict liability on an association for acts and omissions by agents of the association who act within the scope of their employment or office. Pursuant to these provisions, "it does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them." *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988); *see also Guttman v. CFTC*, 197 F.3d 33, 39-40 (2d Cir. 1999). Additionally, that an agent's actions are illegal does not automatically place those acts outside of his scope of employment. *See e.g.*, *Guttman*, 197 F.3d at 39-40 (upholding Commission's finding of principal-agent

liability under Section 2(a)(1)(B) of the Act, where agent engaged in trading that was both within scope of employment, and illegal); *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 323-30 (S.D.N.Y. 2014) (company may be liable under Section 2(a)(1)(A) of the Act for agents' violations of the Act within scope of employment, including any acts intended to serve any purpose of the employer).

Crater and Gillespie committed the fraudulent acts described above and in the Complaint as agents of MBCP. In fact, MBCP's operations are coextensive with Crater's and Gillespie's conduct. Crater and Gillespie fraudulently solicited customers on behalf of MBCP. Gomersall Decl. at ¶¶ 27-31, 32-35. Because the fraudulent acts Crater and Gillespie committed occurred within the course and scope of their work for MBCP, the company is liable for their illegal conduct under Section 2(a)(1)(A) of the Act.

## V.    CONCLUSION

For the foregoing reasons, the Commission requests that the Court issue an *ex parte* temporary restraining order: (1) freezing Defendants' and Relief Defendants' assets by prohibiting them from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property; and (2) prohibiting Defendants and Relief Defendants from destroying, altering or disposing of any books and records or other documents.

Dated: January 16, 2018              Respectfully submitted,

Traci L. Rodriguez, Chief Trial Attorney
Jonah E. McCarthy, Trial Attorney
John Einstman, Chief Trial Attorney
Paul G. Hayeck, Deputy Director (Mass. Bar No. 554815)
Attorneys for Plaintiff
**COMMODITY FUTURES TRADING COMMISSION**
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5312 (Hayeck direct)
phayeck@cftc.gov (Hayeck email)