UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

My Big Coin Pay, Inc., My Big Coin, Inc.,
Randall Crater, Mark Gillespie, John Roche, and
Michael Kruger,

Defendants,

Kimberly Renee Benge, Kimberly Renee Benge
d/b/a Greyshore Advertisement a/k/a Greyshore
Advertiset, Barbara Crater Meeks, Erica Crater,
Greyshore, LLC, Greyshore Technology, LLC,

Relief Defendants.

Case No. 1:18-cv-10077-RWZ

ECF Case

**AMENDED COMPLAINT FOR
INJUNCTIVE AND OTHER
EQUITABLE RELIEF AND FOR
CIVIL MONETARY PENALTIES
UNDER THE COMMODITY
EXCHANGE ACT AND
COMMISSION REGULATIONS**

**JURY TRIAL DEMANDED**

## I.    INTRODUCTION

1.    Since at least January 2014 through the present, the company My Big Coin Pay,

Inc. ("MBCP"), My Big Coin, Inc. ("MBC Inc."), Randall Crater ("Crater"), Mark Gillespie

("Gillespie"), John Roche ("Roche"), and Michael Kruger ("Kruger") (collectively,

"Defendants"), operated a virtual currency scheme in which they fraudulently offered the sale of

a fully-functioning virtual currency, My Big Coin ("MBC"), a commodity in interstate

commerce.  From at least January 2014 through at least June 2017, Defendants obtained more

than approximately $6 million from at least twenty-eight customers ("MBC Customers") through

fraudulent solicitations.

2.    Defendants fraudulently solicited potential and existing MBC Customers

throughout the United States by making false and misleading claims and omissions about MBC's

value, usage, and trade status, and that MBC was backed by gold.  In this regard, the MBC website, maintained and operated by Defendants, conveyed to potential and actual MBC Customers numerous solicitation materials, MBC trade data, and other materials (1) misrepresenting that MBC was actively being traded on several currency exchanges, including the MBC Exchange website (https://mybigcoinexchange.com), when in fact it was not; (2) misrepresenting in reports the daily trading price, when in fact no price existed because MBC was not trading; and (3) misrepresenting that MBC was backed by gold, when in fact it was not. In reality, the supposed trading results were illusory, and any payouts of funds to MBC customers were derived from funds fraudulently obtained from other MBC Customers in the manner of a Ponzi scheme.

3.      As MBC Customers began to raise questions about their MBC accounts, Defendants attempted to conceal their fraud by providing additional coins to them and falsely representing that they had secured a deal with another exchange to trade MBC.  Defendants encouraged MBC Customers to refrain from redeeming their MBC holdings until MBC was active on this "new" exchange.

4.      Defendants misappropriated virtually all of the approximately $6 million they solicited from MBC Customers.  Defendants used these misappropriated funds to purchase a home, antiques, fine art, jewelry, luxury goods, furniture, interior decorating and other home improvement services, travel, and entertainment.  As a result, MBC Customers have lost most, if not all, of their funds due to Defendants' fraud and misappropriation.

5.      Through this conduct, Defendants were engaged, are engaging, or are about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-27f (2012), and the Commission's Regulations ("Regulations"), 17 C.F.R. pts. 1-190

(2017), specifically, Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

6.      Defendants funneled customer funds or arranged for customers to send their funds to the accounts of Kimberly Renee Benge, Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset, Barbara Crater Meeks, Erica Crater, Greyshore, LLC, and Greyshore Technology, LLC (collectively "Relief Defendants"). The Relief Defendants have no legitimate claim to the customer funds they hold, or they have collected, all of which were obtained as a result of the Defendants' fraudulent conduct.

7.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

8.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.      JURISDICTION AND VENUE

9.      **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), provides that district courts have jurisdiction to hear actions

brought by the Commission for injunctive relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in, an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

10.    The Commission has anti-fraud authority over the conduct and transactions at issue in this case pursuant to Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

11.    **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants are found in, inhabit, or transact business in the District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.  As alleged in this complaint, Defendants fraudulently solicited numerous customers in the District of Massachusetts, receiving in excess of $5 million from those customers.

## III.    THE PARTIES

12.    Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

13.    Defendant **My Big Coin Pay, Inc.** is a corporation based in Las Vegas, Nevada. MBCP was incorporated on October 9, 2014.  MBCP's last known address is 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.  MBCP has never been registered with the Commission.

14.     Defendant **My Big Coin, Inc.** is a corporation based in Las Vegas, Nevada. MBC Inc. was incorporated on April 28, 2014. MBC Inc.'s last known address is 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169. MBC Inc. has never been registered with the Commission.

15.     Defendant **Randall Crater** is a resident of East Hampton, New York. Crater is a founder of MBCP and a Director of MBC Inc. Crater has never been registered with the Commission.

16.     Defendant **Mark Gillespie** is a resident of Hartland, Michigan. Gillespie solicited MBC Customers on behalf of MBCP and MBC Inc. Gillespie has never been registered with the Commission.

17.     Defendant **John Roche** is a resident of Newport Beach, California. Roche is the President of MBCP and MBC Inc. Roche has never been registered with the Commission.

18.     Defendant **Michael Kruger** is a resident of Glendale, Arizona. Kruger solicited MBC Customers on behalf of MBCP and MBC Inc. Kruger has never been registered with the Commission.

## IV.     **RELIEF DEFENDANTS**

19.     Relief Defendant **Kimberly Renee Benge** ("Relief Defendant Kimberly Benge") is a resident of Ronda, North Carolina. Benge is Crater's sister. Benge has never been registered with the Commission.

20.     Relief Defendant **Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset** ("Relief Defendant Greyshore Advertisement") maintained its business address at 1643 Old Highway 21, State Road, North Carolina and is operated by Benge. It also

used the address of 81 Newtown Lane, Suite 328, East Hampton, New York. It has never been registered with the Commission.

21.     Relief Defendant **Barbara Crater Meeks** is a resident of Elkin, North Carolina. She is Randall Crater's mother. Meeks has never been registered with the Commission.

22.     Relief Defendant **Erica Crater** is a resident of East Hampton, New York. She is Crater's wife. Erica Crater is the Secretary of MBCP. Crater has never been registered with the Commission.

23.     Relief Defendant **Greyshore, LLC** ("Greyshore") is a limited liability company based in Longwood, Florida. It was formed on May 17, 2010. Greyshore's last known address is 280 South Ronald Reagan Boulevard, Suite 203, Longwood, Florida but previously it used the address of 81 Newtown Lane, Suite 328, East Hampton, New York. Defendant Crater is the CEO of Greyshore. Greyshore has never been registered with the Commission.

24.     Relief Defendant **Greyshore Technology, LLC** ("Greyshore Technology") is a limited liability company based in East Hampton, New York. It was operational from at least January 2014 through at least June 2017 and its last known address is 81 Newtown Lane, Suite 328, East Hampton, New York. Defendant Crater is the CEO of Greyshore Technology. Greyshore Technology has never been registered with the Commission.

## V.     STATUTORY BACKGROUND

25.     Virtual currencies, like MBC, are encompassed in the definition of "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012). For the purposes of this Complaint, a virtual currency means a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction. Virtual currencies are distinct from "real" currencies, which are the coin and paper money of the

United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance. Virtual currencies typically use cryptographic protocols to secure transactions in that asset and use decentralized networks to track transactions between persons who are denominated only by publicly visible strings of characters. The transactions are captured in single blocks at a time, which independent operators (called "miners," a virtual analogy to actual miners whose efforts unearth gold, silver, and other precious metals) confirm by performing algorithmic proofs of work and for which they are usually awarded a sum of the virtual currency in question. The public nature of the decentralized ledger allows people to recognize the transfer of virtual currency from one user to another without requiring any central intermediary in which both users need to trust.

## VI.   FACTS

### A.   Defendants Made False and Misleading Representations, and Omitted Material Facts, To Solicit MBC Customers

26.     From at least January 2014 to present, in an effort to capitalize upon the public's heightened awareness of, and interest in purchasing virtual currencies, Defendants solicited potential MBC Customers to purchase MBC, a virtual currency with a similar sounding name to a more commonly known virtual currency, "Bitcoin." Defendants also solicited MBC Customers to invest in MBCP and MBC Inc. (collectively, "the MBC Entities") by purchasing both stock in a company which had merged with MBCP and alleged licenses related to the medical marijuana business and marijuana derivative products such as Trokie, a marijuana-based lozenge.

27.     Defendants used the names of the MBC Entities and MBC interchangeably in communications with customers when discussing the sale of MBC and these other products, including the sale of stock.

7

28.     Many MBC customers coupled their purchases of MBC with the purchase of stock in the MBC Entities.  As recently as January 2018, Defendant Crater represented to MBC customers that stock share certificates in the MBC Entities would be issued to them.

29.     Defendants solicited potential MBC Customers and, along with the Relief Defendants, received and directed deposits, withdrawals, and transfers of MBC Customer funds.

30.     In their promotion of MBC, Defendants claimed that "merchants and consumers [could] process transactions with our new digital currency [MBC]" on the MBC Inc. website. Defendants further claimed that "any person with a valid email account [could] send or receive my big coins (MBC)," and "[MBC] is quoted, at the current value of the coin that day." Defendants provided MBC Customers with access, via the MBC Inc. website, to their individual accounts which reported their MBC balances, transactions, and the current value of MBC.

31.     Defendants' solicitations to potential MBC Customers to purchase MBC included false and misleading representations and omissions of material facts—in short, lies and deceit— about MBC's active trading status, rising prices, and the currency's merits.

32.     Defendants made these false and misleading representations and omissions of material facts to potential MBC Customers from at least January 2014 through at least February 2018 via the MBC Inc. website, other websites associated with the Defendants, YouTube videos, press releases, and posting on various social media platforms, such as Facebook, LinkedIn, and chatroom websites.

33.     For example, on August 15, 2015, Defendants posted a YouTube video in which Defendants claimed that MBC was a fully-functioning virtual currency that could be used to buy goods and services, and that was actively trading on "[s]everal currency exchanges . . . for dollars, euros, and more" and stated that MBC was the only virtual currency backed by gold to

give prospective customers the illusion that MBC was safe to purchase. The video directed

potential MBC Customers to visit the MBC Inc. website, www.MyBig Coin.com, for more

information. The MBC Inc. website later claimed that MBC could be traded through the MBC

Exchange. Defendants further claimed that MBC could be purchased, sold, traded, donated, and

used to make purchases, and that MBC was "a global currency that lets you send money

anywhere, anytime in any currency."

34.     During the Relevant Period, the Defendants made changes to text of the website

and, in later iterations, a more expansive explanation of how a customer could use MBC

appeared. In the version of the website operational in January 2018, the website claimed:

> My Big Coin is a virtual currency. With MBC you can:
> Mine, Stake, Buy, Sell, Send, Receive, Trade, Shop and Donate all
> around the world & Earn 1% Interest Per Year!

The YouTube video also contained the representation that MBC had partnered with MasterCard

with the promise that MBC could be used anywhere MasterCard was accepted. These

representations were false. The MBC Inc. website reiterated the MasterCard association. In

addition to promoting an alleged agreement with MasterCard on the MBC Inc. website, the logos

of the credit card companies American Express, Visa, and Discover also appeared in order to

promote a pretense of legitimacy. The MBC Inc. website contains a link to the MBCP website,

http://mbcpays.com, which displayed the logos of these same credit card companies. On

November 4, 2014, Defendants issued the following press release on CISION, which advertises

itself as a "PR Newswire" (https://www.prnewswire.com/news-releases/mybigcoinpay-incs-co-

founder-randall-crater-announces-the-crypto-currency-exchange-companys-agreement-to-have-

its-own-branded-master-card-attached-to-its-e-wallet-281455731.html) which contained a link to

other CISION MBCP press releases and read in part:

> *MyBigCoinPay Inc.'s Co-Founder Randall Crater Announces the*
> *Crypto-Currency Exchange Company's Agreement to have its own*
> *Branded Master-Card* [sic] *attached to its e-Wallet . . .*
> MyBigCoinPay Inc., a Nevada Corporation and a worldwide
> exchange portal for Crypto-Currency transfers, trades and buy [sic]
> and sell [sic] services announces today that it has reached an
> agreement with TRUCASH aka DCR Strategies Inc, a Canadian
> Corporation, for the implementation of a customized branded pre-
> paid master card [sic] program. Whereby [sic] cardholders will
> have access to their e-Wallet funds 24/7 enabling them to purchase
> MyBigCoin, the exchanges [sic] branded Crypto-Currency, along
> with buying products, goods and services worldwide in real time.

These statements were false because at the time of the statement and afterwards, MBCP did not

have such an agreement with TRUCASH.

35.     The MBC Inc. website also contained a link to "the MBC Mall," a website,

http://bigcoinmail.com, which advertised that "you can purchase any of the products we have

using your MBC[.]" Products purportedly offered for sale included Apple and Sony electronics.

The contact page on the MBC Mall shows that it shares the same mailing address of Relief

Defendants Greyshore and Greyshore Technology, entities operated by Defendant Crater.

36.     Furthering the illusion of MBC's value, MBC Customers could monitor their

purchases and sales of MBC through their account on the MBC Inc. website. MBC Customers

could also view the purported current price of MBC on the MBC Inc. website and could view or

participate in MBC trading on the MBC Exchange website. For example, on September 21,

2015, the MBC Exchange website reported the last exchange trade of MBC at $410 USD; a high

trade at $500 USD and a low trade at $60 USD. The website also additionally reported the latest

trade volumes and prices. Defendants told MBC Customers that the Defendants had created the

exchange so customers could trade MBC. These statements by Defendants were false and

misleading representations and omitted material facts. In fact, MBC was not actively traded on

any currency or other exchange, was not backed by gold, was not associated with MasterCard or

any other credit card company, and could not be used "to send money anywhere, anytime in any currency."

37. Further, while the MBC Inc. website reflected that MBC Customers owned a certain number of MBCs, these account statements were false and misleading representations and omissions of material facts. For example, MBC Customers could not exercise any ownership rights in relation to their MBC because they could not trade their MBC or withdraw funds from their individual accounts. When one MBC customer complained about the MBC Exchange not functioning, Defendant Gillespie, in an email dated August 2, 2014, attempted to appease that MBC customer by falsely claiming that MasterCard was refining the MBC Exchange and improving its functionality. Referring to the MBC Inc. website and Crater's business partnership with MasterCard, Gillespie claimed MasterCard had "committed huge resources to his website and the exchange site that [MasterCard] are developing."

38. Defendants' statements about the daily price or value of MBC were also false and misleading and omitted material facts. From at least January 2014 through at least June 2017, Defendants arbitrarily changed the "price" or value of MBC to make it appear as though it fluctuated in an effort by Defendants to replicate price changes that might be observed in any other actively traded commodity. For example, on September 23, 2015, the reported price of MBC on the MBC Inc. website was $389.86 USD and on November 9, 2015, the reported price of MBC on the MBC Inc. website was $547.34 USD. When one MBC Customer questioned Gillespie about the fluctuation in MBC's price, Gillespie admitted that Crater would arbitrarily change the price, indicating the price was not based on actual trading. The increasing prices for MBC on the website and the MBC Exchange website were illusory and false.

11

39.     From at least January 2014 through at least June 2017, Defendants echoed the false and misleading representations and omissions of material facts contained on the MBC Inc. and MBC Exchange websites regarding the rising value or price, usage, and gold-backing of MBC, on social media accounts they controlled.  For example, on the MBC Inc. Facebook page, Defendants solicited potential MBC Customers by touting the rising trading value of MBC in U.S. Dollars through statements such as the following false and/or misleading postings related to supposed MBC value or price, usage and relationship with MasterCard, and backing by gold:

A.     **Value or price**

i.     January 27, 2014:  "Today current value is $28.87 USD." Gillespie posted a comment to this post on February 10, 2014 at 2:26 p.m. "$32.26----and going VERTICAL!!!"

ii.    February 28, 2014:  "Today #MYBIGCOIN (MBC) Current value $47.56 USD."

iii.   March 15, 2014:  "...Current value $57.99 USD"

iv.    April 19, 2014:  "...Current value $76.57 USD"

v.     May 21, 2014:  "...Current value $102.13 USD"

vi.    September 7, 2014:  "...Current value $111.66 USD"

vii.   November 8, 2014:  "...Current value $121.38 USD"

B.     **Usage**

i.     March 7, 2014:  "...Sign up today to receive your My Big Coin Visa/MasterCard."

ii.    September 3, 2015:  "The First Crypto-Currency MasterCard easy access to your money use at any atm's and anywhere MasterCard is accepted!"

C.     **Gold Backing**

i.     March 6, 2014:  "The Wait is Over !!! Officially... My Big Coin has Entered into a Contract where All My Big Coin's will be Backed 100% by Gold. My Big Coin. www.MyBigCoin.com."

    ii.      March 7, 2014: "The only crypto currency to back your money with gold."

    iii.     August 6, 2015: "The first Crypto Currency to be backed by Gold."

**40.**    These and similar statements about MBC's value or price, usage, and backing by gold were false and misleading representations and omitted material facts.

**41.**    Defendants also made false and misleading representations and omitted material facts to potential and existing MBC Customers from at least January 2014 through at least June 2017 through Internet chat room posts, with false statements regarding the rising trading price such as the following on the Internet chatroom, Raging Bull, http://ragingbull.com:

> February 13, 2014: "my friends and family are all in 'My Big Coin'– we all got in around 20.00 – its now at 32.26 . . . [t]his will go through the roof – I encourage all to give it a look!"

This Internet chat room post quoted the same price that Gillespie also posted on the MBC Facebook page.

**42.**    From at least January 2014 through at least June 2017, such Internet chat room solicitations touting MBC's supposed rising trading value or price, usage, and gold backing were publicly available.

**43.**    From at least January 2014 through at least February 2018, Defendant Crater made false and misleading representations and omitted material facts regarding MBC to potential and existing MBC customers on his website randall.crater.me, which featured a profile picture of Crater.  On his website, Crater claimed that MBC could be used to "Spend Virtual And Traditional Currencies Anywhere Major Payment Cards Are Accepted."  Crater went on to explain that "[w]e are a payment network for fiat and crypto-currency storage and exchange" and "[w]e facilitate instant payments in a safe and secure manner globally, MyBigCoin is a peer-to-peer system and cryptocurrency."  Crater further explained that '[u]sing cryptography to control

the creation and transfer of money, coins are created by a process called mining[]" and that

"[w]allet and exchange customers can spend crypto currency like money."  Crater's website

contained fraudulent statements about MBC's historic trading value ("My BigCoin Statistics

200 High Value  60 Low Value" ); the ability of customers to withdraw MBC via wire transfers,

direct deposit or through ATM debit cards; and gold backing ("MyBigCoin Backed by Bullion").

Further, Crater falsely claimed under the section entitled "Complete Control" that  users could

"[v]iew balances and transactions details, send money, and transfer funds from any of [their]

accounts" and claimed that through the "MYBigCoin"  system, users had available a "global

ATM network," "online shopping worldwide", "point of sale purchases," "multi-currency

accounts," and "near instant transfers."

    **44.**    This claim about a "global ATM network" was echoed by Defendant Gillespie in

an email dated February 3, 2014, in which Gillespie claimed that the "World Bank of Mexico has

approved [MBC] as a currency for over 20K ATM's[.]"

    **45.**    Defendant Crater made public statements about his affiliation with, his

responsibilities and his authority at MBC Inc. on each of his LinkedIn profile pages.  During the

relevant time, Crater had two LinkedIn profile pages, one in which he listed directly under his

name that he was "Owner/CEO at Greyshore Technology" and listed his location as "East

Hampton, New York" ("Greyshore Tech profile"), and the second in which he listed under his

name that he was "Director" at "MyBigCoin" and listed his location as "Lake Mary, Florida"

("MyBigCoin profile").

    **46.**    In his Greyshore Tech profile, under the category entitled "Experience," Crater

listed himself as "Creator/Developer" of MBC Inc., and included the website addresses for the

MBC Entities, and the Facebook and Twitter page addresses for MBC Inc.  In this section of his

profile Crater made false and misleading representations and omitted material facts about MBC, including:

1.   "We are the only Cryptocurrency to be backed by Gold!"

2.   "We are partners with Mastercard witch[sic] gives us a closed loop system so your [sic] able to brake [sic] down into any currency that's needed!"

"MasterCard is accepted in over 35.9 million locations!"

3.   "Send money $$$ in seconds anywhere in the world!"

4.   "Amazingly Low transfer fees!"

5.   "MyBigCoin Inc is the only Commercial based Cryptocurrency in the World!"

47.   Defendant Crater also made false and misleading representations and omitted material facts about MBC through videos posted on his eponymous YouTube channel, "Randall Crater." For example, in a video entitled "Randall Crater Crypo Currency," published on October 21, 2014, a woman appears in the video proclaiming the "quality" of MBC. Under the posted video, the following statement appears:

Randall Crater's MyBigCoin is a global currency that lets you send money anywhere, anytime in any currency. Sending and accepting money is fast and easy. Register for an account and begin accepting in minutes! Visit htttp://randallgcrater.com/for more.

These statements were false. Other videos on this channel feature the same woman from this first video who appears to also be promoting the sale of MBC.

48.   Defendant Roche also made false and misleading representations and omitted material facts about MBC through postings on the MBC Inc. Facebook website, his personal Facebook page, and YouTube. For example, on June 19, 2015, Roche posted the following on the MBC Inc. Facebook page, "My big coin just hit $460 dollars a coin today[.]..Thank u all the

support" and on October 5, 2015, he posted "My big coin 500 dollars last buy today." These statements were false regarding the value of MBC.

49.     Defendants also made false and misleading representations and omitted material facts directly to MBC Customers from at least January 2014 through at least June 2017 in person and via email and text messages.

50.     Although not limited, these false and misleading representations and omissions related to usage of MBC, and the fact that MBC was backed by gold.

51.     For example, on April 3, 2014, Gillespie sent an email to a MBC customer in which he wrote "all good with MBC...VERY good in fact. Each coin is now backed with gold! So, our currency and accounts are backed better than the FDIC backs your money in the bank!"

52.     A few days later, on April 8, 2014, Gillespie sent an email to a potential MBC customer and reiterated the false statement that MBC was backed by gold and made other false statements about MBC and the MBC Entities to lend legitimacy to the fraudulent enterprise he was involved in. Gillespie wrote:

> There is another company I am working for called My Big
> Coin...they are rewriting the text books for global currency and
> they go public with an IPO in less than 90 days.
> I've been offered a "hat" and a board position that I am accepting-
> will leave job I LOVE within 60 days.
> I know you've heard of "Bitcoin"-after news gets out on MBC,
> you won't hear of them again...we are in negotiations in 22
> countries to stabilize their currencies and economies and we are the
> only digital currency in the world backed by gold.

53.     Gillespie continued to peddle the myth of MBC two years after he made the above fraudulent and misleading statements. On March 4, 2016, Gillespie sent an email to a customer who was dissatisfied with his MBC purchase that included several material false statements regarding MBCP and MBC. Gillespie wrote:

16

> Our funding (in the hundreds of millions) I'm told, should hit this week...by the end of the week MBC[P] will buy up any and all coin you want to sell on the Exchange...
>
> Things could not possibly be better-Randall [Crater] is in an unnamed South American country since yesterday, at their request, striking a deal to use our gold-backed coin to stabilize their economy.
>
> We have signed deal, 50/50 partnership with one of the largest companies in the world on their phone payment system.

These statements were false.

54.    Like Gillespie, from at least January 2014 through at least June 2017, Defendant Crater also made multiple false representations to a MBC Customer about MBC being backed by hundreds of millions of dollars of gold, and Crater's ongoing negotiations with multiple governments around the world to use MBC to either stabilize their economy or replace the country's traditional currency.

55.    For example, on January 28, 2015, Crater sent an email to that same MBC Customer which read "...we have 300 million in gold backing us they have nothing show [sic] you how strong we are going to be [.]" This statement was false.

56.    He also texted this MBC customer on March 2, 2016, and falsely claimed to be on the phone with the "prime minister of finance of Venezuela" and "17 lawyers" regarding the use of MBC by the Venezuela government.

57.    Defendant Kruger solicited multiple customers to purchase MBC from the MBC Entities.  For example, Kruger met an individual at a restaurant in the Back Bay neighborhood of Boston in February 2014 and while soliciting him to purchase MBC, told him that Crater was the designer of the MBC platform and controlled the MBC Entities.  Kruger provided this customer with the terms for the purchase of MBC, including price and corresponding number of coins.

Later, per Kruger's request, Defendant Gillespie provided this customer by email the link to the MBC Inc. website so the customer could create his account and provided him wiring instructions to purchase MBC. As instructed, the individual transferred funds to buy MBC.

58. At the February 2014 meeting and afterwards, Kruger made additional false and misleading representations and omitted material facts about MBC to this customer, including that MBC was backed by gold. On April 4, 2014, Kruger sent an email to the customer, in which he claimed "[we] are back by Gold."

59. Defendants made these false and misleading representations and omitted material facts to potential as well as existing MBC Customers on the MBC Entities and MBC Exchange websites, other websites associated with Defendants, on Internet social media and chatroom websites, in email communications, in text communications, and in person, and did so knowingly or with reckless disregard for the truth. Over the course of this scheme, Defendants have revised their fraudulent statements on the MBC Inc. website.

**B.    Defendants Misappropriated MBC Customers' Funds**

60. From at least January 2014 through at least June 2017, Defendants received in excess of approximately $6 million from at least twenty-eight MBC Customers.

61. From at least January 2014 through at least June 2017, Defendants misappropriated almost all of these MBC Customers' funds for improper and unauthorized uses, such as to wrongfully enrich themselves and the Relief Defendants.

62. From at least January 2014 through at least June 2017, Defendants directed MBC Customers to transfer funds into bank accounts controlled by or operated for the benefit of Defendants and Relief Defendants.

63.     For instance, Defendants instructed MBC Customers to transfer funds by wire or through written checks into bank accounts held in the names of Relief Defendants Greyshore Advertisement, Greyshore LLC, Greyshore Technology, Barbara Crater Meeks, and Defendant Gillespie.

64.     Upon receipt or very soon after receipt of MBC Customers' funds, the MBC Customer funds were transferred to other accounts controlled by Defendants or Relief Defendant Erica Crater, or withdrawn to make purchases for Defendants' or Relief Defendants' own financial benefit.  On occasion, MBC Customer funds were transferred illegally to other MBC Customers to cover up Defendants' fraud.

65.     For example, MBC Customer funds for the purchase of MBC were transferred to a bank account in the name of "Kimberly Renee Benge d/b/a Greyshore Advertisemet a/k/a Greyshore Advertiset."  On September 12, 2014, Relief Defendant Kimberly Benge withdrew funds from this account and purchased a cashier's check made out to "Kimberly Benges Greyshore Advertisment" in the amount of $1,849,370.38.  The next business day, September 15, 2014, this cashier's check was deposited into a bank account held in the name of Greyshore LLC.  On September 19, 2014, Defendants and/or Relief Defendants wired $631,523.79 from the Greyshore LLC bank account to a real estate settlement company in Florida with the notation "Other Home Purchase."  On or about September 26, 2014, Relief Defendant Erica Crater purchased a home for the price of approximately $645,000 using the funds transferred to the real estate settlement company.  A similar pattern repeated itself throughout the period from at least January 2014 through at least June 2017 with MBC customer funds being wired to Crater's or Erica Crater's personal bank accounts from Relief Defendants' bank accounts or used to make purchases in the amount of at least $339,689 at a jewelry store in Southampton, New York; at

least $209,000 at an East Coast based marina; and at least $517,719.27 at an auction house that specialized in fine art and antiques in Southampton, New York. Defendants and/or Relief Defendants withdrew via ATM transactions over $56,000 of MBC Customer funds from the Relief Defendant Greyshore Advertisement's bank account, and Relief Defendant Kimberly Benge personally withdrew at least $489,000 from this account at bank branch offices. None of the funds obtained from MBC Customers were used to buy MBC for MBC Customers.

66.     To the extent any MBC customers received any funds from the Defendants, those funds in fact consisted of funds that Defendants misappropriated from other MBC Customers, in the nature of a Ponzi scheme.

C.     **Crater Was a Controlling Person of the MBC Entities**

67.     Crater was a controlling person of the MBC Entities. Crater was a founder of MBCP, a Director of MBC Inc., and the creator/developer of MBC. Crater controlled the content on the MBC Entities', MBC Exchange's, and the MBC Mall websites, including setting the purported trading price of MBC. Agents of the MBC Entities represented to MBC Customers and MBC Customers believed that Crater was the owner of the MBC Entities. Crater either directly or indirectly controlled the operation of the bank accounts to which MBC Customers transferred funds under the belief that they were purchasing MBC.

D.     **Crater Acted as an Agent for the MBC Entities**

68.     Through his solicitation of potential and existing MBC Customers and active marketing of MBC including, without limitation, providing information regarding the merits of owning MBC to potential and existing MBC Customers and providing existing customers with additional MBC after they raised concerns about their inability to trade MBC, Crater acted as an agent of the MBC Entities.

**E.    Gillespie Acted as an Agent for the MBC Entities**

**69.**    Through his actions in marketing and soliciting customers, through direct communications and posting on social media, and directing MBC Customers to transfer funds which they believed were for the purchase of MBC to bank accounts controlled by Defendants, Gillespie acted as an agent of the MBC Entities.

**F.    Roche Was a Controlling Person of the MBC Entities**

**70.**    Roche was a controlling person of the MBC Entities.  Roche was the CEO of each of the MBC Entities.  As a senior officer of the company, he had the ability to control the marketing information which appeared on the MBC Entities' websites, social media sites and YouTube, including the fraudulent and misleading representations and omitted material facts about the price of MBC, its backing by gold, and trading activity which appeared on these Internet sites.

**G.    Roche Acted as an Agent for the MBC Entities**

**71.**    Through his actions in marketing MBC on the MBC Entities' website, social media sites and YouTube, Roche acted as an agent for the MBC Entities.

**H.    Kruger Acted as an Agent for the MBC Entities**

**72.**    Through his actions in marketing and soliciting customers, through in-person and email communications, including negotiating the price and quantity of MBC which the customer's purchased from the MBC Entities, Kruger acted as an agent of the MBC Entities.

**I.    Relief Defendants Received Funds to Which They Have No Legitimate Claim**

**73.**    As described above, on multiple occasions, Relief Defendants have received MBC Customer funds that were obtained as a result of Defendants' fraudulent conduct.  Relief

Defendants have no legitimate interest in the MBC Customer funds that they obtained or

received.  The funds funneled to the Relief Defendants exceeded $6 million.

## VII.  VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Fraud by Deceptive Device or Contrivance

#### Violations of Section 6(c)(1) of the Act and
#### Regulation 180.1(a) by Defendants

74.     Paragraphs 1 through 73 are re-alleged and incorporated herein by reference.

75.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any

person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any
> swap, or a contract of sale of any commodity in interstate
> commerce, or for future delivery on or subject to the rules of any
> registered entity, any manipulative or deceptive device or
> contrivance, in contravention of such rules and regulations as the
> Commission shall promulgate by not later than 1 year after July 21,
> 2010, [the date of enactment of the Dodd-Frank Wall Street
> Reform and Consumer Protection Act] . . . .

76.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides:

> It shall be unlawful for any person, directly or indirectly, in
> connection with any swap, or contract of sale of any commodity in
> interstate commerce, or contract for future delivery on or subject to
> the rules of any registered entity, to intentionally or recklessly:
> (1) Use or employ, or attempt to use or employ, any manipulative
> device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement
> of a material fact or to omit to state a material fact necessary in
> order to make the statements made not untrue or misleading;
> (3) Engage, or attempt to engage, in any act, practice, or course of
> business, which operates or would operate as a fraud or deceit
> upon any person . . . .

77.     Virtual currencies are encompassed in the definition of "commodity" under

Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).

.

78.    As described above, Defendants violated Section 6(c)(1) of the Act and

Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities

in interstate commerce, making or attempting to make untrue or misleading statements of

material fact or omitting to state or attempting to omit material facts necessary in order to make

statements made not untrue or misleading, including without limitation, the following:

A.    Issuing written statements misrepresenting that MBC was actively being
traded on several currency exchanges, including the MBC Exchange;

B.    Verbally telling MBC Customers that MBC would be listed on a new
exchange when trading on the MBC Exchange was unsuccessful;

C.    Issuing written statements misrepresenting the daily trading price of MBC;

D.    Issuing written statements misrepresenting that MBC was backed by gold;

E.    Issuing written statements misrepresenting that MBC could be purchased,
sold, traded, donated, and used to make purchases;

F.    Issuing written statements misrepresenting that MBC was a global
currency that allowed customers to send money anywhere at any time in
any currency;

G.    Issuing written statements misrepresenting that MBC could be used
anywhere that MasterCard was accepted;

H.    Issuing written statements misrepresenting that the MBC Entities were
affiliated or had a relationship with the credit card companies Visa,
MasterCard, American Express, and/or Discover;

I.    Issuing written statements misrepresenting that MBC could be used at the
"MBC Mall" to purchase products;

J.    Issuing written statements misprepresenting that customers owned a certain
number of MBC and that MBC could be sold or customers could withdraw
their funds; and

K.    Failing to disclose, and omitting, that Defendants were misappropriating
MBC customer funds.

79.    As described above, Defendants violated Section 6(c)(1) of the Act and

Regulation 180.1(a) by, among other things, in connection with contracts of sale of a commodity

in interstate commerce, soliciting customers with false and misleading statements about MBC's

trading activity, usage, value, affiliation with credit card companies, and backing by gold;

providing MBC Customers with false statements misrepresenting that customers owned a certain

number of MBC and that MBC could be sold or customers could withdraw their funds; and

misappropriating MBC Customers' funds.

**80.**    Defendants engaged in the acts and practices described above willfully,

intentionally, or recklessly.

**81.**    By this conduct, Defendants violated Section 6(c)(1) of the Act and Regulation

180.1(a).

**82.**    The acts, omissions, and failures of Crater described in this Amended Complaint

occurred within the scope of his agency, employment, or office at MBC Entities. Accordingly,

the MBC Entities are liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012),

and Regulation 1.2, 17 C.F.R. § 1.2 (2017), as a principal for its agent's acts, omissions, or

failures in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

**83.**    At all times relevant to this Amended Complaint, Crater controlled the MBC

Entities, directly or indirectly, and did not act in good faith or knowingly induced, directly or

indirectly, the MBC Entities' conduct constituting the violations of the MBC Entities described

in this Count. Accordingly, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012),

Crater is liable for the MBC Entities' violations of Section 6(c)(1) of the Act and Regulation

180.1(a).

**84.**    At all times relevant to this Complaint, Roche controlled the MBC Entities,

directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly,

the MBC Entities' conduct constituting the violations of the MBC Entities described in this

Count. Accordingly, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Roche is liable for the MBC Entities' violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

85.    The acts, omissions, and failures of Gillespie described in this Complaint occurred within the scope of his agency, employment, or office at the MBC Entities. Accordingly, the MBC Entities are liable under Section 2(a)(1)(B) of the Act and Regulation 1.2 as principal for its agent's acts, omissions, or failures in violation of  Section 6(c)(1) of the Act and Regulation 180.1(a).

86.    The acts, omissions, and failures of Kruger described in this Complaint occurred within the scope of his agency, employment, or office at the MBC Entities.  Accordingly, the MBC Entities are liable under Section 2(a)(1)(B) of the Act and Regulation 1.2 as principal for its agent's acts, omissions, or failures in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

87.    Each act of (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in a fraudulent or deceitful act, practice, or a course of business, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

### Count II – Disgorgement of Funds from Relief Defendants

88.    The allegations set forth in paragraphs 1 through 87 are re-alleged and incorporated herein by reference.

25

**89.**     Defendants have engaged in a fraudulent investment scheme that defrauded Defendants' customers.

**90.**     Relief Defendants have received funds that were obtained as a result of Defendants' fraudulent conduct.

**91.**     Relief Defendants have no legitimate entitlement to, or interest in, the funds received from Defendants' fraudulent conduct.

**92.**     Relief Defendants should be required to disgorge the funds they received from Defendants' fraudulent conduct, or the value of those funds that Relief Defendants may have subsequently transferred to third parties.

**93.**     By reason of the foregoing, Relief Defendants hold funds in constructive trust for the benefit of customers who were victimized by Defendants' fraudulent scheme.

## VIII.   RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

**A.**     An order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2012);

**B.**     An order of permanent injunction enjoining each Defendant and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with any Defendant, including any successor thereof, from:

> **i.**     Engaging, directly or indirectly, in conduct in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), or Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017);

ii.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

iii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for their own personal account(s) or for any account in which Defendants have a direct or indirect interest;

iv.     Having any commodity interests traded on Defendants' behalf;

v.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

vi.     Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vii.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

viii.   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration, or required to be registered with the Commission (except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017));

C.     An order directing each Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act and Regulations, as described herein;

D.     An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E.     An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds any Defendant received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

F.     An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

G.     An order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received

28

from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least January 2014 to the date of such accounting;

     **H.**     An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012);

     **I.**     An order requiring Relief Defendants, as well as any of their successors or assigns, to disgorge to any officer appointed or directed by the Court, all ill-gotten gains and other benefits received from Defendants, including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from Defendants as a result of Defendants' acts or practices that constitute violations of the Act and the Regulations, including post-judgment interest; and

     **J.**     An order providing such other and further relief as the Court deems proper.

*    *    *

Dated:  April 20, 2018

COMMODITY FUTURES TRADING
COMMISSION

By:

Traci L. Rodriguez
Chief Trial Attorney
trodriguez@cftc.gov

Jonah E. McCarthy
Trial Attorney
jmccarthy@cftc.gov

John Einstman
Chief Trial Attorney
jeinstman@cftc.gov

Paul G. Hayeck
Deputy Director (Mass. Bar. No. 554815)
phayeck@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, D.C. 20581
Phone: (202) 418-5980
Fax: (202) 418-5428

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served on those indicated as non-registered participants.

Dated:  April 20, 2018

Traci L. Rodriguez

**COMMODITY FUTURES TRADING COMMISSION**
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5980 (Rodriguez direct)
trodriguez@cftc.gov (Rodriguez email)

*Attorney for Plaintiff*