UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>My Big Coin Pay, Inc., My Big Coin, Inc., Randall Crater,<br>Mark Gillespie, John Roche, and Michael Kruger,<br><br>    Defendants,<br><br>Kimberly Renee Benge, Kimberly Renee Benge d/b/a<br>Greyshore Advertisement a/k/a Greyshore Advertiset, Barbara<br>Crater Meeks, Erica Crater, Greyshore, LLC, Greyshore<br>Technology, LLC,<br><br>    Relief Defendants. | Case No. 18-CV-10077-RWZ |

**PLAINTIFF'S OPPOSITION TO DEFENDANT CRATER AND RELIEF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Plaintiff Commodity Futures Trading Commission ("Commission") respectfully submits its opposition to Defendant Randall Crater and all Relief Defendants' (collectively, "Moving Defendants") motion to dismiss the Amended Complaint.

**SUMMARY**

Defendant Crater seeks to avoid liability for a long-running fraudulent scheme that he and his co-Defendants (who have not joined the motion) My Big Coin Pay, Inc., My Big Coin, Inc., Mark Gillespie, John Roche, and Michael Kruger (collectively, "Defendants") operated, by arguing that this Court cannot hear this case and that their virtual currency fraud, through which they scammed at least twenty-eight people out of more than $6 million, is outside the reach of the Commission's anti-fraud authority. Moving Defendants' motion is meritless.

First, although Moving Defendants argue that the Amended Complaint should be dismissed for lack of subject matter jurisdiction, they cannot dispute that this Court has authority to hear this case under 28 U.S.C. § 1331 (2012) and 28 U.S.C. § 1345 (2012), because it involves a federal question and is brought pursuant to the Commission's statutory authority.

Second, Moving Defendants argue that the Amended Complaint should be dismissed for failure to state a claim because:  (1) Defendants' fraudulent brand of virtual currency, My Big Coin ("MBC"), is not a "commodity" under Section 1a(9) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 1a(9) (2012); (2) Defendants' fraudulent scheme does not fit within the charged provisions; and (3) a snippet of investigative testimony—outside the pleadings— purportedly contradicts the Commission's theory of misappropriation.

As shown below, these arguments are meritless.  MBC, which Defendants pitched as a fully-functioning virtual currency that could be bought, sold, donated, and used to buy products worldwide, is a "commodity" under the Act.  Further, the plain language of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. § 180.1(a) (2017), and cases applying those provisions, cover Defendants' fraudulent scheme. Finally, the numerous allegations in the Amended Complaint describing in detail how Defendants fraudulently solicited and misappropriated the $6 million they fraudulently obtained from customers, easily satisfies the Commission's burden to state its claim for relief.

## SUMMARY OF FACTUAL ALLEGATIONS

Since at least January 2014, Defendants have engaged in a fraudulent virtual currency scheme in which they solicited customers to purchase a fully-functioning virtual currency, MBC, by repeatedly making false and misleading claims about MBC's value, usage, trade status, and financial backing.  (Am.  Compl. (ECF No. 63) ¶¶ 1-4.)  Through their lies and deceit,

Defendants obtained and misappropriated more than $6 million from at least twenty-eight customers, using the money to enrich themselves and finance lavish lifestyles, purchasing a home, fine art, luxury cars, and more.  (*Id.*)  Defendants fraudulently solicited customers in this District, and did so knowingly or with reckless disregard for the truth.  (*Id.* ¶¶ 11, 57-89.)

## I.    Defendants' Fraudulent Scheme Involved a Fully-Functioning Virtual Currency.

Defendants' fraudulent scheme involved My Big Coin, a virtual currency whose name sounds like Bitcoin, a functionally similar and well-known virtual currency.  (*Id.* ¶ 26.) Defendants pitched their virtual currency as a particular item that was separately identifiable, unique, and moveable from one wallet or owner to another.  (*See id.* ¶¶ 1, 30, 33-38, 43, 46.) Defendants represented that each individual MBC could be bought, sold, donated, and used to buy products worldwide.  (*Id.* ¶¶ 33-38, 43-47.)  These representations, however, were false.

## II.   Defendants Fraudulently Solicited Customers To Purchase My Big Coin and Misappropriated Customer Funds.

Defendants' fraud involved making material misrepresentations and omissions to customers about MBC via email, websites, YouTube, press releases, social media, and in person. (*Id.* ¶¶ 30-59.)  Defendants lied that MBC could be bought, sold, donated, and used to make purchases.  (*Id.* ¶¶ 33-39, 43-47.)  Defendants also lied about a partnership with MasterCard, and that MBC was actively trading.  (*Id.* ¶¶ 33-39, 46.)  Finally, Defendants lied that MBC was backed by millions of dollars in gold, and would be used to stabilize the economies of twenty-two countries, giving the illusion that MBC was a safe bet.  (*Id.* ¶¶ 33, 39, 42-46, 50-55, 58.)  In addition to their solicitation fraud, Defendants misappropriated customer funds.  Through their lies, Defendants conned people into giving them more than $6 million for what Defendants represented was a fully-functioning coin.  Defendants did not deliver a fully-functional coin, as promised.  Instead, they spent the money on themselves, living lavishly.  (*See id.* ¶¶ 60-65.)

## STANDARD ON A MOTION TO DISMISS

"In ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1209-10 (1st Cir. 1996). In federal question cases, a dismissal for lack of jurisdiction is proper only where the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-83 (1946).

Contrary to Moving Defendants' arguments, in ruling on a Rule 12(b)(1) motion, the court's focus is on the allegations in the pleadings, not the evidence. *See Aversa*, 99 F.3d at 1209-10. Moreover, it is well established that "factual challenges" to subject matter jurisdiction and the "no presumptive weight" standard apply to challenges to *diversity* jurisdiction not *federal question* jurisdiction. (Mem. Supp. Mot. to Dismiss 3-4 (ECF No. 69) ("Mem.").) *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001). Moving Defendants' assertion that the court in *CFTC v. Zelener*, No. 03 C 4346, 2003 WL 22284295, at *1 (N.D. Ill. Oct. 3, 2003), *aff'd*, 373 F.3d 861 (7th Cir. 2004), dismissed that case because "the Court lacked jurisdiction … because the trading at issue did not involve futures contracts and thus the [Act] did not apply," (Mem. 3,) is patently false. That quote is not from the court's *holding*, but from the discussion of the *defendant's argument*. *Id.* at *2.[1]

Under Rule 12(b)(6), a motion to dismiss should be denied where a complaint contains sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must accept all

---

[1] In fact, the Court stated that it was unclear if the argument amounted to a challenge to subject matter jurisdiction or to whether the Commission had stated a claim. 2003 WL 22284295, at *2.

factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. Am. Airlines*, 199 F.3d 68, 69 (1st Cir. 2000).

When faced with motions to dismiss under Rule 12(b)(1) and (b)(6), in federal question cases, "the preferable practice is to assume that jurisdiction exists and proceed to determine whether the claim passes muster under Rule 12(b)(6)." *Estate of Soler v. Rodriguez*, 63 F.3d 45, 47 n.1 (1st Cir. 1995); *see also Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010); *SEC v. SG Ltd.*, 142 F. Supp. 2d 126, 131 n.2 (D. Mass. 2001) (premising dismissal under Rule 12(b)(6) not Rule 12(b)(1) because the court had "subject matter jurisdiction to determine whether a federal claim existed"), *rev'd on other grounds*, 265 F.3d 42 (1st Cir. 2001). The conflicting standard Moving Defendants propose does not apply in federal question cases like this case. *See Ne. Erectors Ass'n of BTEA v. Sec. of Labor*, 62 F.3d 37, 39 n.1 (1st Cir. 1995).

## ARGUMENT

### I.     This Court Has Subject Matter Jurisdiction over this Action.

This Court plainly has subject matter jurisdiction here under 28 U.S.C. § 1331 (2012) and 28 U.S.C. § 1345 (2012). Under § 1331, District Courts have subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Jurisdiction exists under § 1331 here because the Amended Complaint arises under federal law, charging violations of 7 U.S.C. § 9(1) (2012). Under § 1345, District Courts have subject matter jurisdiction over all civil actions commenced by any federal agency expressly authorized to sue by an Act of Congress. Jurisdiction exists under § 1345 here because the Commission filed this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(a) (2012), which expressly authorizes the Commission to sue. Accordingly, the Rule 12(b)(1) motion should be denied.

Moving Defendants' argument that the Court lacks subject matter jurisdiction because MBC is not a "commodity" is misplaced. (Mem. 4-7.) Whether MBC is a "commodity" is a

merits question not a jurisdiction question.  *See Ortiz de Arroyo v. Barcelo*, 765 F.2d 275, 279 (1st Cir. 1985) ("Subject matter jurisdiction does not depend on the plaintiffs' ability to prove the elements of their cause of action …The complaint must merely demonstrate that the matter in controversy arose under the … laws of the United States."); *see also Morrison*, 561 U.S. at 254 (exploring the distinction between subject matter jurisdiction and the separate merits question).[2]

## II.     The Amended Complaint Sufficiently Pleads Violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

Moving Defendants argue the Amended Complaint fails to state a claim because there is no violation under the Act, as their brand of virtual currency, MBC, is not a "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).  (Mem. 1, 4-14.)  Notably, Moving Defendants do not challenge the Amended Complaint's allegations that Defendants employed a fraudulent scheme, made material misrepresentations, and engaged in a fraudulent business practice, or that they acted with scienter.  (*See id*.)  As shown below, the virtual currency, MBC is a "commodity" under the Act, and therefore, the motion to dismiss should be denied.

### A.     The Virtual Currency MBC Is a "Commodity" Under the Act.

The Act defines "commodity" to include a list of generic agricultural items[3] "*and all other goods and articles, except onions … and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and* all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9)

---

[2] It is unnecessary for the Court to obtain jurisdiction separately over the claim to the funds held by the Relief Defendants, as Moving Defendants concede.  (Mem. 14 n.31.)  *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191-92 (4th Cir. 2002).

[3] The list includes, "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice[.]"  7 U.S.C. § 1a(9) (2012).  As a generic list, it does not specify grades, brands, or varieties of the commodities, covering, for example, the various species of livestock.

(emphases added). Moving Defendants argue MBC is not a "commodity" as "it is not a service, right, or interest in which contracts for future delivery are presently dealt in." (Mem. 4-6.)

Moving Defendants are wrong because, as a threshold matter, virtual currencies like MBC fall within the separate category of "commodities" under the Act: "all other goods and articles[.]" 7 U.S.C. § 1a(9); *see CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) (Weinstein, J.) ("Virtual currencies are 'goods[.]'") The definition of commodity is intended to be expansive, covering asset categories from agricultural commodities; to natural resources such as oil, gas, and metals; to services, rights, and interests; and more. *See, e.g.*, *Dunn v. CFTC*, 519 U.S. 465, 469 (1997) (stating that Congress "dramatically expanded the coverage" of the Act by broadening the definition of "commodity" in the 1974 CFTC Act); *see also* 7 U.S.C. § 1a(19) (applying the category "excluded commodity" to a subset of commodities that included any "rate, differential, index, or measure of economic or commercial . . . value"); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 37–38 (D.D.C. 2015) (holding that contracts tied to events and statistics falling within the definition of "excluded commodity" were commodity options).

Moving Defendants incorrectly assert that MBC and similar virtual currencies are not "goods" or "articles" because they are not "tangible." In fact, goods and articles need not be tangible. This is true on the face of § 1a(9), which contains a carve-out from that category for "motion picture box office receipts (or any index, measure, value, or data related to such receipts)." If goods and articles could not be intangible, the "index, measure, value, or data" exception would be superfluous. It is also true as a matter of ordinary meaning. *See Goods*, Black's Law Dictionary (10th ed. 2014) ("[t]angible or movable personal property other than money; esp., articles of trade or items of merchandise <goods and services> . . . .[t]hings that

have value, whether tangible or not"); *Accusoft Corp. v. Quest Diagnostics*, Civ. No. 12-40007-TSH, 2015 WL 7242151, at *4 (D. Mass. July 24, 2015) (noting that courts have found that software constitutes goods under the U.C.C.), *report and recommendation adopted*, 2015 WL 7265916 (D. Mass. Sept. 28, 2015); *see also Article, Oxford English Dictionary* (3d ed. 2010) ("[a] particular material thing, esp. one belonging to a specified class; … an item of goods or property.  Also occasionally used of an immaterial thing.").

Indeed, prior to the development of virtual currencies, traditional foreign currencies were recognized as "goods."  *Dunn,* 519 U.S. at 470.  Similar to government-issued currencies, "[v]irtual currencies are 'goods' exchanged in a market for a uniform quality and value." *McDonnell*, 287 F. Supp. 3d at 228.  Defendants pitched MBC as a particular item that is separately identifiable, unique, and moveable from one owner to another.  (*See* Am. Compl.¶ 1 (describing MBC as a fully-functioning virtual currency), ¶ 30 (describing how anyone could receive the coin and access their accounts), ¶ 34 (describing the electronic wallet).)  Defendants also claimed that each MBC had a value and could be bought, sold, donated, and used to buy products worldwide.  (*Id.* ¶¶ 33-43, 46-48.)  Thus, virtual currencies like MBC fall within the category of "all other goods and articles" and therefore are commodities.

**B.    As a "Good" or "Article," MBC Is a "Commodity" by Definition Regardless of Whether Futures Contracts for It Exist.**

Moving Defendants concede, as they must, that "goods and articles" are "commodities" regardless of whether there are futures contracts on them.  (*See* Mem. 4-6.)  In the statutory definition, the modifier concerning futures contracts "presently or in the future dealt in," applies as a matter of syntax, punctuation, and grammar, only to "services, rights, and interests":

> and all other goods and articles, except onions … and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or

data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

7 U.S.C. § 1a(9)*; see Barnhart v. Thomas*, 540 U.S. 20, 21 (2003) (applying the grammatical "rule of the last antecedent" under which a limiting clause is read to modify only the phrase it immediately follows);[4] *see also CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 241 (S.D.N.Y. 2012) (holding that the Act "defines 'commodity' to include (a) goods and articles *as well as* (b) services, rights, and interests that are the subject of a futures contract" (emphasis added)).[5] Regardless, as shown below, even if the "dealt in" limitation applied to "goods and articles," the "dealt in" limitation is satisfied here because futures contracts in a similar virtual currency, Bitcoin, are currently "dealt in."

### C. Even If MBC Was a Service, Right, or Interest, It Would Still Be a "Commodity" Under the Act.

If MBC were to be considered a service, right, or interest it would still be a "commodity" under the Act because futures contracts in similar virtual currencies, like Bitcoin, are currently "dealt in." Moving Defendants' argument that their fraudulent brand of virtual currency cannot be a "commodity" under the Act unless and until a futures contract on it is traded ignores that "commodities" are defined generically and categorically under the Act. Moreover, Moving Defendants' proposed, overly narrow interpretation of § 1a(9) leads to absurd results, and if accepted, would create legal uncertainty and confusion in the market.

Congress defined commodities under the Act categorically, not by type, grade, quality, brand, producer, manufacturer, or form. For example, Congress included "wheat," "livestock,"

---

[4] Note the absence of a comma before "in which contracts for future delivery are presently or in the future dealt in." The legislative history of § 1a(9), including the report Moving Defendants cite, further supports that the "dealt in" phrase applies only to "services, rights, and interests." *See* S. Rep. No. 93-1131, at 34 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5870 ("Section 201 of the bill enlarges the definition of 'commodity' to include all goods and articles, except onions, and 'all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in.'"); H.R. Rep. No. 93-975, at 10 (1974) (same).

[5] The court in *McDonnell* assumed without analysis that the "dealt in" limitation applies to "goods and articles," but that was not in issue as the virtual currencies there were the subject of futures contracts. 287 F. Supp. 3d at 228.

and all "fats and oils" within the definition of "commodity." 7 U.S.C. § 1a(9). Congress did not

separately identify the types of wheat (e.g., hard red spring, soft red winter), livestock (e.g.,

cows, hogs), or fats and oils (e.g., vegetable or animal) that exist. Similarly, oil and natural gas

are "commodities" under § 1a(9) regardless of by whom or where the oil or gas is extracted or

delivered (e.g., crude oil from west Texas or Prudhoe Bay in Alaska). *See, e.g.*, *United States v.*

*Valencia*, No. Civ.A. H-03-024, 2003 WL 23174749, at *8 (S.D. Tex. Aug. 25, 2003) (rejecting

trader's argument that "West Coast gas" was not a "commodity" under the Act where there was

no futures contract for "West Coast gas" because the court found that "[n]atural gas is … a

commodity"), *order vacated in limited part on reconsideration*, 2003 WL 23675402 (Nov. 13,

2003); *rev'd*, 394 F. 3d 352 (5th Cir. 2004); *see also United States v. Futch*, 278 F. App'x 387,

395 (5th Cir. 2008) (concluding that the location for natural gas delivery "does not in any way

limit the type of commodity in question, natural gas"). Further, as Moving Defendants concede,

the "generic categories" of commodities Congress added in 1974 were intended to be broad and

categorical. (*See* Mem. 7.) *See also* S. Rep. No. 93-1131, at 34; H.R. Rep. No. 93-975, at 10.

Further, Moving Defendants' interpretation would lead to absurd results. Section 1a(9)

cannot be read to allow a defendant who is in the virtual currency business to lie, cheat, and steal

when it comes to virtual currencies similar to Bitcoin, which do not underlie futures contracts,

but not when it comes to a virtual currency underlying a futures contract, like Bitcoin.[6]

Simply put, a "commodity" for purposes of § 1a(9) is broader than any particular type or

brand of that commodity, as Moving Defendants suggest. Assuming *arguendo* that virtual

currencies like MBC are "services, rights, or interests," the question is not whether futures

contracts on the specific type of virtual currency MBC are "dealt in." MBC is a "commodity"

---

[6] Further, whether virtual currency is a "commodity" under § 1a(9) impacts the Commission's core, and exclusive authority over virtual currency based derivative products. *See* 7 U.S.C. § 2(a)(1)(A) (Commission has exclusive jurisdiction over, among other things, "contracts of sale of *a commodity* for future delivery") (emphasis added).

because futures contracts on the functionally similar virtual currency Bitcoin currently are "dealt in." My Big Coin shares a nearly identically sounding name to Bitcoin and many similar characteristics, including how the coins are secured (cryptography), stored (in a wallet), and that they can be bought, sold, and traded. (*See* Am. Compl. ¶¶ 1, 25, 26, 30, 33-43, 46, 47, 52.)

### D. Moving Defendants' Revisionist History of the Enactment of the Commodity Futures Trading Commission Act of 1974 Must Be Rejected.

To support their overly narrow reading of § 1a(9), Moving Defendants argue that Congress included the phrase "in which contracts for future delivery are presently or in the future dealt in"—the key to their entire motion to dismiss—to address a concern the Treasury Department raised during debate on what ultimately became the Commodity Futures Trading Commission Act of 1974 (the "1974 Act"), Pub. L. No. 93-463, 88 Stat. 1389. (*See* Mem. 7-9.) Moving Defendants are simply wrong, and their argument should be rejected.

Although it is true that during debate on the 1974 Act, the Treasury Department raised a concern about the Commission having authority over off-exchange foreign currency futures trading in light of the proposed, broadened definition of "commodity,"[7] it is not true that Congress addressed that concern—even in part—by including the phrase "in which contracts for future delivery are presently or in the future dealt in" in § 1a(9). To the contrary, Congress addressed the Treasury Department's concern in an entirely separate provision, which has come to be known as the "Treasury Amendment." *See Dunn*, 519 U.S. at 468-70 (quoting the "dealt-in" phrase and concluding that as part of the 1974 Act, which dramatically expanded the definition of "commodity," Congress also enacted the Treasury Amendment).

---

[7] *See* Letter to Herman E. Talmadge, Chairman of the Senate Committee on Agriculture and Forestry from Donald L.E. Ritger, Acting General Counsel, Department of the Treasury, dated July 30, 1974, *reprinted in* S. Rep. No. 1131, at 39-41 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 5843, 5887-89.

The very letter Moving Defendants cite in support of their argument reveals the misleading nature of their argument. (*See* Mem. 8 n.11.) First, the "dealt-in" phrase was already in the proposed bill when Acting General Counsel Ritger sent his letter to Chairman Talmadge. *See* 1974 U.S.C.C.A.N. at 5888 (raising concern with proposed Section 201, which included the phrase "in which contracts for future delivery are presently or in the future dealt in"). The argument that Congress addressed a concern by adding a phrase that was already in the proposed bill, and which contributed to the concern in the first place, is illogical. Moreover, Ritger did not propose limiting the definition of "commodity," but rather, he proposed inserting a new section to exclude from the new agency's authority certain foreign currencies and financial instruments that otherwise would fall within the newly expanded definition of a commodity. *Id*. at 5889. Tellingly, Congress left the definition of "commodity" the same after the Ritger letter, and enacted the Treasury Amendment, which tracks almost identically the language the Treasury Department proposed. *See* 88 Stat. 1395 (codified at 7 U.S.C. § 2 (1970 ed., Supp. IV)).

> ### E.    Moving Defendants' Argument Is Belied by Commission Orders Concerning Virtual Currencies Like MBC.

Defendants argue that the reasoning in two Commission Orders[8] concluding that virtual currency is a "commodity" provides no basis for the proposition that all virtual currencies are "commodities" because those Orders involved only Bitcoin, "the only virtual currency upon which futures are traded." (Mem. 10-12.) Moving Defendants' argument is disingenuous.

First, Moving Defendants mischaracterize the Commission's allegations here. This case does not involve *all* virtual currencies. This case involves only one virtual currency, MBC, which shares many similar characteristics to Bitcoin, including how the coins are secured, stored,

---

[8] *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, at *5 (June 2, 2016) (consent order); *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015) (consent order).

bought, sold, etc.  (*See* Am. Compl.¶¶ 1, 25, 26, 30, 33-43, 46, 47, 52.)  Here, the Court need not

resolve broader questions about whether all (or which) virtual currencies are "commodities."

More importantly, despite going to lengths to discuss both Commission Orders, Moving

Defendants make a major concession that reveals the flaw in their argument.  Moving

Defendants concede that the Commission was correct to find that Bitcoin was a "commodity"

under § 1a(9) in these Orders.  (*See* Mem. 10-12.)  The flaw in this argument, however, is that at

the time of each Order, there were no futures contracts traded on Bitcoin.[9]  And the

Commission's findings, which Moving Defendants concede are correct, did not turn on whether

futures contracts existed, but only on the nature of the virtual currencies at issue.  *See In re*

*BFXNA*, 2016 WL 3137612, at *5; *In re Coinflip*, 2015 WL 5535736, at *2.[10]

Contrary to Moving Defendants' specious arguments, the Commission's consistent

findings in these Orders and other statements[11] that virtual currencies like Bitcoin and others are

"commodities" within the meaning of § 1a(9) support denial of the motion.  In this regard, even

if the definition of "commodity" was ambiguous, which it is not, the Commission's informed,

consistent, and reasonable interpretation of the Act, whose administration is entrusted to the

Commission, would be entitled to deference.  *United States v. Mead Corp.*, 533 U.S. 218, 226-27

(2001); *see also Wax v. Aventis Pasteur Inc.*, 240 F. Supp. 2d 191, 192-94 (E.D.N.Y. 2002)

(noting policy statements and other non-regulatory pronouncements may be entitled to weight).

---

[9] The first Bitcoin futures contract was not listed until December 18, 2017.

[10] That Bitcoin swaps or options existed at the time of the Orders is of no moment.  As Moving Defendants concede, § 1a(9) references "contracts for future delivery," not other derivative contracts within the Commission's authority.

[11] *See, e.g.*, Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60,335 (Dec. 20, 2017) (proposed rules providing guidance on transactions involving virtual currency); CFTC, *Customer Advisory: Understand the Risks of Virtual Currency Trading* (Dec. 15, 2017), attached as Exhibit A; CFTC, A CFTC Primer on Virtual Currencies (Oct. 17, 2017), attached as Exhibit B.

**F.** *McDonnell* **Is Instructive Not Inapposite as Moving Defendants Boldly Assert.**

Not surprisingly, Moving Defendants attempt to distance themselves from the recent decision in *CFTC v. McDonnell*. There, the court held that that virtual currencies "fall well-within … the [Act's] definition of 'commodities'" and the Commission "has standing to exercise its enforcement power over fraud related to virtual currencies sold in interstate commerce." 287 F. Supp. 3d at 228, 230. Although *McDonnell* involved allegations of fraud in connection with Bitcoin and Litecoin, it is misleading at best to claim that it does not support the conclusion that MBC—a virtual currency with many similar characteristics to Bitcoin—is also a commodity.

First, the court held that "*[v]irtual currencies* can be regulated by [the Commission] as a commodity." *Id*. at 228 (emphasis added).[12] The court also held that the Commission has "standing to exercise its enforcement power over fraud related to *virtual currencies* sold in interstate commerce." *Id*. at 230 (emphasis added). Further, although the court assumed without analysis that the phrase "in which contracts for future delivery are presently or in the future dealt in" applied to virtual currency as a "good," there is no indication, much less text, in the opinion supporting that the existence of futures contracts on Bitcoin was central to the court's holding. *See id*. at 228.

Second, the court's reasoning supports that MBC—which Defendants pitched as similar in function to Bitcoin—is a "commodity." The court went to great lengths to describe and define Bitcoin, and virtual currency generally, identifying common characteristics including that they are digital assets used as a medium of exchange, stored electronically in wallets, exchanged online through a peer-to-peer system, and use cryptographic protocols to secure transactions recorded on publicly available decentralized ledgers. *Id*. at 218, 225. Thus, the court's holding

---

[12] As the court noted, the Commission's authority over virtual currency does not preclude other agencies from exercising their authority "when virtual currencies function differently than derivative commodities." *Id*. at 228.

is not limited only to Bitcoin, but extends to other virtual currency, like MBC, that share these characteristics.  As discussed herein, MBC not only shares an almost-identically sounding name to Bitcoin, but it shares many similar characteristics, including how the coins are secured, stored, bought, sold, etc.  (*See* Am. Compl. ¶¶ 1, 25, 26, 30, 33-43, 46, 47, 52.)

## III.  Defendants' Fraudulent Misrepresentations and Misappropriation Fit Squarely Within 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

Moving Defendants argue that the Amended Complaint should be dismissed because Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), prohibit only manipulation, not fraud.  (Mem. 14-17.)  This argument ignores the plain language of both provisions and is contrary to case law.

### A.  Section 9(1) and 17 C.F.R. 180.1(a) Unambiguously Prohibit Fraud Whether or Not There Is Manipulation.

"The starting point for [the] interpretation of a statute is always its language."  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989).  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Where, as here, the words of the statute are unambiguous, the "judicial inquiry is complete."  *Id*. at 254.

Section 9(1) and 17 C.F.R. § 180.1(a) are unambiguous.  Section 9(1) prohibits "any manipulative or deceptive device or contrivance" in connection with a contract of sale of a commodity in interstate commerce.  Similarly, 17 C.F.R. § 180.1(a)(1) prohibits "any manipulative device, scheme, or artifice to defraud."  Section 180.1(a)(3), which does not even include the word "manipulation," makes it unlawful to engage "in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."  The word "or" in § 9(1) and 17 C.F.R. § 180.1(a)(1) "indicates the disjunctive," *United States v. Notarantonio*, 758 F.2d 777, 783 (1st Cir. 1985), so "only one of [the provisions'] prongs needs to be

15

satisfied[,]" *Noonan v. Winston Co.*, 135 F.3d 85, 92 (1st Cir. 1998). The word "any" means there are no further limitations. *HUD v. Rucker*, 535 U.S. 125, 131 (2002). Section 9(1) and 17 C.F.R. § 180.1(a) therefore cover actions that are "deceptive" but not necessarily "manipulative," including fraudulent misstatements. *See CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1008 (N.D. Ill. 2015) (holding that "Section 6(c)(1) and Regulation 180.1 establish three separate causes of action including fraud"); *see also McDonnell*, 287 F. Supp. 3d at 217 (holding that the Commission's "broad authority extends to fraud *or* manipulation" (emphasis added)).[13]

### B. Moving Defendants' Justifications for Ignoring the Text of Section 9(1) and 17 C.F.R. § 180.1(a) Are Meritless.

With the statutory text squarely against them, Moving Defendants urge the Court to disregard the statute's text on the basis of legislative history consisting only of two cherry-picked paragraphs from the floor statements of Senators Lincoln and Cantwell. (Mem. 15.) However, only a "conclusive statement in the legislative history" that Congress meant to deviate from the "ordinary understanding" of the text may justify disregarding the words of the statute. *Ardestani v. INS*, 502 U.S. 129, 136 (1991).

Here, nothing in the legislative history contradicts the text of § 9(1), let alone is there a "conclusive statement."[14] Moreover, legislators' speeches are "among the least illuminating forms of legislative history." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017). As a result, "[f]loor statements from two Senators cannot amend the clear and unambiguous language of a

---

[13] Moving Defendants argue that if the Court dismisses Count I, there can be no violation on which to seek disgorgement from Relief Defendants, and therefore Count II should be dismissed. (Mem. 17 n.42.) As shown herein, the motion to dismiss Count I should be denied. Thus, Count II should not be dismissed, as the Commission has properly pleaded its claim against Relief Defendants. (Am. Compl. ¶¶ 6, 60-65, 73.) *See FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 214 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010).

[14] If there were any doubt, the legislative history of the phrase "manipulative or deceptive device or contrivance" would extinguish it: Congress copied this text from Section 10(b) of the Securities and Exchange Act of 1934 "34 Act"), 15 U.S.C. § 78j, perhaps the best known anti-fraud statute in American law, *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1131 (9th Cir. 1975) (finding it "unnecessary to set out in *Haec verba* the well-known proscriptions of Section 10(b)"). The same applies to Rule 180.1(a), which as Moving Defendants concede, "essentially mimics the antifraud provisions contained in the [34 Act.]" (Mem. 14 n.33. (noting the expectation that courts would rely on the 34 Act and its implementing regulation when the Commission brings an action under its "antifraud provisions").)

statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002). In any event, nothing in the speeches contradicts the text. Indeed Moving Defendants do not contend otherwise, resting instead on *silence* in those speeches—i.e., the Senators discussed manipulation but not misrepresentations. That has no bearing. *Dewsnup v. Timm*, 502 U.S. 410, 419-20 (1992) ("[W]here the language is unambiguous, silence in the legislative history cannot be controlling.").

Equally as meritless is Moving Defendants' reliance on a snippet from the Commission's adopting release. (Mem. 16.) That snippet, which is consistent with the regulatory text and therefore controlling, states that "fraud or manipulation" are both prohibited. (*Id.*) *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation'" (citation omitted)). Like the statute, the rule prohibits fraud unconnected to manipulation.

Moving Defendants rely on *Kraft*—a futures-manipulation case—for the proposition that the Court need not follow the text of § 9(1). (Mem. 17.) However, *Kraft* says nothing of the kind and, in fact, supports the Commission. There, the court explained that § 9(1) and the related 17 C.F.R. § 180.1 establish three separate prohibitions on conduct *including* traditional fraud: "(1) the use of manipulative devices to defraud; (2) the use of schemes to defraud; and (3) the use of artifices to defraud." *Kraft*, 153 F. Supp. 3d at 1008.

Moving Defendants also rely on *CFTC v. Monex Credit Co.*, No. SACV-17-01868, 2018 WL 2110935, at *8 (C.D. Cal. May 1, 2018), tellingly burying the crux of the court's flawed holding in a footnote. (Mem. 16 & n.39.) Indeed, two weeks after issuing the decision, the *Monex* court *sua sponte* certified the case for interlocutory appeal, stating that "there is substantial ground for difference of opinion." *Monex*, No. 8:17-cv-01868 (C.D. Cal. May 15,

2018), ECF No. 194.  That understates things.  In *Monex*, the court concluded that the "or" in

§ 9(1) should not be read literally, but must instead be read as an "and," even though the court

acknowledged that the text of § 9(1) "suggests that Congress intended to prohibit either

manipulative or deceptive conduct."  2018 WL 2110935, at *8.  To be sure, the text does more

than "suggest" that—it explicitly says that, which ought to have been "the end of the matter."

*Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984).  Yet the court simply dismissed

Congress' choice of words as "careless."  *Monex,* 2018 WL 2110935, at *8.  Congress, however,

was not at all careless—it chose its words deliberately.  *See supra* n.14.  But even if it were, a

court has no power to rewrite a statute on that basis.  *Lamie v. U.S. Tr.*, 540 U.S. 526, 542

(2004).  As Moving Defendants admit, the sole basis for the *Monex* court's erroneous claim of

the authority to revise "careless" statutory text was *De Sylva v. Ballentine*, 351 U.S. 570, 573

(1956).  The Court in *De Sylva*, however, stressed repeatedly that the text there was ambiguous.

*See, e.g.*, *id.* at 573 ("hardly unambiguous"), 577 (noting "substantial doubt" by the agency), 578

("statute is far from clear").  Section 9(1) is unambiguous, and *De Sylva* therefore is inapplicable.

Moving Defendants also cite *Monex* for the proposition that the Court may disregard the

text of § 9(1) in favor of the section's heading.  (Mem. 16.)  However, "the heading of a section

cannot limit the plain meaning of the text."  *Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S.

519, 529 (1947).  Notably, Moving Defendants do not even attempt to defend other erroneous

underpinnings of *Monex*, which is in any event not controlling.[15]

## IV.     The Amended Complaint Pleads Fraud with Sufficient Particularity.

Moving Defendants argue, in a footnote, that the Amended Complaint must be dismissed

because it fails to plead fraud with particularity.  (Mem. 17 n.43.)  This argument is easily

---

[15] For example, the court improperly applied the "rule against surplusage," which is inapplicable to unambiguous text like § 9(1) and where, as here, the very act of applying the rule would render other text meaningless.  *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011).

dispensed with.  Particularity under Rule 9(b) requires the "specification of the time, place, and content of an alleged false representation[.]"  *See McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980); *see also CFTC v. M25 Invs. Inc.*, No. 3:09-CV-1831-M, 2010 WL 769367, at *2 (N.D. Tex. Mar. 6, 2010) ("When the complaint details the defendants' scheme and apprises them of the basic transaction(s) upon which fraud is alleged, an enforcement action may be less specific with respect to when and where the alleged fraud occurred.")

Here, the numerous allegations describing the particulars of the fraudulent transactions and misrepresentations easily satisfy Rule 9.  (*See e.g.*, Am. Compl.¶ 30 (quoting specific promotional materials), ¶¶ 33, 34, 47 (quoting misrepresentations on YouTube and in a press release), ¶ 35 (quoting false statements on websites), ¶ 36 (describing with examples false trade reports), ¶ 38 (providing examples of false prices), ¶ 39 (providing the date, text, and place published for 12 misrepresentations), ¶¶ 44, 51-53, 55, 58 (quoting specific emails).)

## V.      The Amended Complaint Sufficiently Pleads Misappropriation.

Moving Defendants argue that the Amended Complaint should be dismissed because the Commission's misappropriation theory is unsupported.  (Mem. 18-19.)  This argument is premature and baseless.  First, the facts on which Moving Defendants rely are outside the pleadings, and on this motion to dismiss the Court should only consider facts alleged in the Amended Complaint.  *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  However, even if considered, the investigative testimony cited supports the Commission.  Moving Defendants claim that the customer's testimony "makes clear that he had no expectation about how the funds he paid to the Defendants would be used once he received his coins."  (Mem. 19.)  That is false.  First, the customer testified that he believed he was buying a fully-functioning virtual currency, MBC, from the Defendants.  Defendants conned the customer.  He did not receive a fully-functioning coin.  Second, the customer testified that he would be "surprised" if the funds he

19

used to buy MBC were used to purchase real estate, or to make payments at a marina or jewelry store.  Finally, the customer also testified that he was "unaware" his funds went directly to Crater, and that he would be "surprised and agitated" if his funds were used for personal use.

Additionally, as discussed above, § 9(1) and 17 C.F.R. § 180.1(a) prohibit all manners of fraud, and the Amended Complaint sufficiently alleges that Defendants engaged in a fraudulent virtual currency scheme, misappropriating over $6 million.  For years, Defendants enticed people to give them money for MBC by lying about it, falsely claiming it was backed by gold and could be bought, sold, was actively trading, etc.  (Am. Compl. ¶¶ 33-58.)[16]  Regardless of how you label the fraud, the fact remains Defendants made false representations to con people into giving them money for MBC.  And, rather than giving people a fully-functioning coin, as promised, they used customers' money to live lavishly, all in violation of the Act.  (*Id.* ¶¶ 60-66.)

## CONCLUSION

For the foregoing reasons, the Court should deny, in its entirety, the Motion to Dismiss.


Dated: May 18, 2018          Respectfully submitted,

By:     /s/ Jonah E. McCarthy
Traci L. Rodriguez
Jonah E. McCarthy (Va. Bar No. 68415)
Paul G. Hayeck, Deputy Director (Mass. Bar No. 554815)
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5515 (McCarthy direct)
jmccarthy@cftc.gov (McCarthy email)

*Attorneys for Plaintiff*

---

[16] The Amended Complaint also sufficiently alleges that customer funds were transferred illegally to other customers to cover up the fraud in the manner of a Ponzi scheme.  (Am. Compl. ¶¶ 2, 64, 66.)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 18, 2018.

/s/ Jonah E. McCarthy
Jonah E. McCarthy

**COMMODITY FUTURES TRADING COMMISSION**
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5515 (McCarthy direct)
jmccarthy@cftc.gov (McCarthy email)

*Attorney for Plaintiff*