UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>                  Plaintiff,<br><br>    v.<br><br>MY BIG COIN PAY, INC.; MY BIG COIN, INC.; RANDALL CRATER; MARK GILLESPIE; JOHN ROCHE; and MICHAEL KRUGER;<br><br>                  Defendants,<br><br>KIMBERLY RENEE BENGE; KIMBERLY RENEE BENGE d/b/a GREYSHORE ADVERTISEMENT a/k/a GREYSHORE ADVERTISET; BARBARA CRATER MEEKS; ERICA CRATER; GREYSHORE, LLC; and GREYSHORE TECHNOLOGY, LLC;<br><br>                  Relief Defendants. | Case No.:<br><br>1:18-cv-10077-RWZ |

**DEFENDANT RANDALL CRATER AND RELIEF DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

The Plaintiff's opposition to the Defendants' motion to dismiss the amended complaint fails to establish that the virtual currency at issue in this case is a "commodity" as that term is defined in the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (the "CEA"). Instead, the Plaintiff offers for the first time that virtual currencies are "goods." That argument is simply inconsistent with what the CFTC has been saying since 2015. In addition, the full legislative history of the CFTC Act of 1974 refutes the CFTC's accusation that the Defendants are engaging in revisionist history. Finally, the CFTC's demand that the Court afford deference to the CFTC's new opinion clearly fails the standards of consistency, formality, care and reasonableness required for deference to be granted.

Setting aside the propriety of resorting to name calling and *ad hominem* attacks in pleadings before a federal court, were the Court to accept this new definition of a commodity under Section 6(c)(1) and Regulation § 180.1, it would anoint the CFTC with jurisdiction over any sales fraud in interstate commerce. But Congress did not intend to task a 450-person agency with expertise in futures and derivatives trading with that job, and the Court's "duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, __ U.S. __, 135 S. Ct. 2480, 2489 (2015). The plain meaning of the definition of the term "commodity," the legislative history of that definition and the addition of Section 6(c)(1) to the CEA, and commonsense lead to one conclusion: the CFTC has no jurisdiction here and has failed to state a claim. Accordingly, the amended complaint should be dismissed with prejudice.

## I. Standards for a Motion to Dismiss

As the *Zelener* court noted, it makes no practical difference whether the Defendants are challenging the Court's jurisdiction or the jurisdiction of the CFTC since either way, it is undisputed that unless the CFTC can show that My Big Coin is a commodity under the CEA, the CFTC cannot maintain this action.[1] But in the interests of narrowing the issues before the Court, the Defendants are willing to have the Court treat their motion to dismiss as a 12(b)(6) motion.

## II. My Big Coin is Not a Commodity

### A. *Virtual Currencies Are Not "Goods"*

In an attempt to avoid the undisputed fact that no futures trade on My Big Coin, the CFTC now says, for the first time, that virtual currencies are "goods or articles." But this is completely inconsistent with the theory the CFTC has proffered since 2015[2] (that Bitcoin is a

---

[1] *CFTC v. Zelener*, 2003 WL 22284295 at *2 (N.D. Ill. 2003), aff'd, 373 F.3d 861 (7th Cir. 2004).
[2] *In re Coinflip, Inc.*, CFTC Docket No. 15-29 at 3 (CFTC Sept. 17, 2015) (citation omitted); *In re BFXNA INC.*, Docket 16-19 at 5-6 (CFTC June 2, 2016) ("*Bitfinex*"); *Primer on Virtual Currencies* (CFTC October 17, 2017) (attached as Docket #70 Ex. B) ("*Primer*"); *CFTC Backgrounder on Self-Certified Contracts for Bitcoin Products* at

commodity not because it is a "good" or "article" but because it is a "service, right, and interest in which contracts for future delivery are presently or in the future dealt in") and it is not what is alleged in the Amended Complaint.

Congress's exception of onions, which are very much tangible, from the category of "goods and articles" makes clear that they refer to tangible products. The CFTC offers up Congress's 2010 ban of movie box office receipt futures by adding them as exceptions to both "goods and articles" and "services rights and interests" as supposedly demonstrating "goods and articles" can be intangible. Opp. Br. at 7. Of course, there is a simpler explanation. One that does not undo basic definitions in place since 1974: Congress simply recognized that movie box office receipts have both a tangible element – cash in the drawer – and intangible element such as credit and debit card payments.

The CFTC also proffers a 2014 Black's Law Dictionary definition, and a district court decision finding software a "good" for the purposes of the Uniform Commercial Code. Opp. Br. at 7-8. The meaning of a term derived from the context of the statute takes precedence over any general definition.[3] To the extent that resort to a dictionary is appropriate, the only relevant definitions are those from the time Congress enacted the language in question: 1974, not 2014.[4] A 1974 Treasury Department letter included in the Senate Report states "[a] futures contract is defined as an agreement to buy or sell for delivery at a future time any specified quantities of goods, services, or other *tangible* or *intangible* things."[5] This phraseology makes clear that "goods" are tangible things and "services" are intangible things. The fact that a court found that

---

2 (CFTC Dec. 1, 2017) ("*Backgrounder*"); and *Retail Commodity Transactions Involving Virtual Currencies,* 82 Fed. Reg. 60335, 60337 n.43 (CFTC Dec. 20, 2017) ("*Interpretation*").
[3] *Abuelhawa v. United States*, 556 U.S. 816, 819-20 (2009) ("because statutes are not read as a collection of isolated phrases, . . .'[a] word in a statute may or may not extend to the outer limits of its definitional possibilities'") *quoting Dolan v. Postal Service*, 546 U.S. 481, 486, (2006).
[4] *Saint Francis College v. Khazraji*, 481 U.S. 604, 609-13 (1987).
[5] S. Rep. 93-1131 93rd Cong. 2d Sess. 1974, 1974 U.S.C.C.A.N. 5843 at 5889 (emphasis added).

software is a "good" under the UCC is irrelevant to what Congress meant by the term in its 1974 amendment of the CEA.

Finally, it seems the CFTC's sole support for the notion that virtual currency is a "good" is strategic cherry picking of *CFTC v. McDonnell*.[6] Opp. Br. at 7. The CFTC quotes the phrase that virtual currencies are "goods" but then omit the very next words: "in which contracts for future delivery are presently or in the future dealt in."[7] Judge Weinstein appears not to have focused on the distinction between goods and services: whether virtual currency was a good or a service was inconsequential because he applied the futures trading requirement to both. In the end, the CFTC offers no real basis to conclude that virtual currency is a "good."

In the alternative, the CFTC argues that if My Big Coin is a service, right or interest, it still is a "commodity" because Bitcoin futures are traded. It argues that Congress did not identify commodities by "type, grade, quality, brand, producer, manufacture or form." Opp. Br at 9. Hence, the CFTC claims, if there are futures on Bitcoin, then My Big Coin is a "commodity." This argument ignores the fact that there are known price and quality relationships to the commodities truly under the CFTC's jurisdiction. For instance, the Chicago Board of Trade's corn contract calls for the delivery of yellow corn #2, but a short has the option of delivering yellow corn #1 for a 1.5 cent premium per bushel or yellow corn #3 for a 1.5 cent discount.[8] There is no such known economic relationship between Bitcoin and other virtual currencies, including My Big Coin. A simple comparison of prices for different virtual

---

[6] 287 F. Supp. 3d 213 (E.D.N.Y. 2018).
[7] *Id.* at 228. CFTC conveniently ignores that many of the cases they cite, like Judge Weinstein, apply the futures trading requirement to goods and articles as well as services, rights and interests: *U.S. v. Futch*, 278 Fed. Appx. 387,390 (5th Cir. 2008) ("Because contracts for future delivery of natural gas are traded on the NYMEX, natural gas is a commodity under the Commodity Exchange Act"); *U.S. v. Valencia*, 2003 WL 23174749 at *5 (S.D. Texas 2003) ("'commodities' includes goods that can be the subject of futures contracts").
[8] Chicago Board of Trade Rule 10104. Available at:
http://www.cmegroup.com/content/dam/cmegroup/rulebook/CBOT/II/10/10.pdf

currencies shows that virtual currencies trade at vastly different prices with price movements that have little long-term correlation to each other.[9]

In its Opposition but nowhere in the Amended Complaint, the CFTC alleges that My Big Coin shares "many similar characteristics [with Bitcoin], including how the coins are secured (cryptography), stored (in a wallet), and that they can be bought, sold and traded." Opp. Br. 11. But the CFTC's own *Primer*, which is attached to its Opposition, refutes this attempt to lump all virtual currencies together:

> It is important to note that there are many other virtual currencies [other than Bitcoin] with sizeable market capitalizations that are built upon various Blockchain technologies, ***but may have different characteristics or functionalities than Bitcoin,*** including Ethereum (or Ether), Litecoin, and Ripple.

*Primer* at 5 n.1.

The CFTC has not offered persuasive support for its -- now two -- theories of how My Big Coin is a "commodity." It is not a "good" as the word was understood by Congress in 1974, and it is not a "service, right or interest in which contracts for future delivery are presently or in the future dealt in." My Big Coin is simply not a "commodity."

B. *The Futures Trading Requirement or "Dealt In" Clause is Jurisdictional*

The CFTC charges that the Defendants' argument that the futures trading limitation was intended to address jurisdictional concerns of the other federal agencies is "revisionist" history. Opp. Br. at 11. This is not so. The "dealt in" language creating the futures trading requirement was jurisdictional in nature from the beginning of Congressional deliberations to amend the CEA stretching back to September 1973. On September 25, 1973, Frederick Uhlmann, Chairman of the Board of the Chicago Board of Trade, testifying before a sub-committee of the House Small

---

[9] P. Ciain & M. Rajcaniova, *Virtual Relationships: Short- and Long-Run Evidence from Bitcoin and Altcoin Markets*, 52 J. Internat'l Fin'l Markets & Money 173, 174 (Jan. 2018) (little long-term price correlation). Available at: https://www.sciencedirect.com/science/article/pii/S1042443117302858

Business Committee, presented proposed legislation to define "commodity" to be everything deliverable on a futures contract.[10] He emphasized the importance of giving the as yet unnamed

> commodity regulatory agency exclusive jurisdiction over futures trading. This would prevent any possible conflicts over jurisdiction over futures trading. This would prevent any possible conflicts over jurisdiction.[11]

After follow-on hearings before the House Agriculture Committee in October 1973,[12] W.R. Poage, Chairman of the House Agriculture Committee, introduced H.R. 11955 on December 13, 1973. That bill included the "dealt in" phrase. Poage explained that provision "[a]ll commodities trading in futures will be brought within federal regulation under the aegis of the new Commission." But that provision included a proviso that preserved the SEC's jurisdiction "over those areas traditionally regulated by it."[13]

At the hearings held by the Agriculture Committee on this bill in January 1974, many witnesses were critical of the SEC proviso. Among the critics was Leo Melamed, the father of financial futures.[14] He thought the proviso was redundant and likely to be confusing. In his view, the jurisdictional import of the expanded definition of the term commodity together with the "dealt in" phrase was clear, and no mention of the SEC's jurisdiction was necessary.[15] These hearings make plain that the "dealt in" clause was very much meant as a jurisdictional provision.

    C.    *The CFTC's Janus-Faced Theories Deserve No Deference*

The CFTC asks that the Court afford its "expert" opinion deference. Opp, Br. at 13. This

---

[10] *Hearings before the Subcommittee on Special Small Business Problems of the House Permanent Select Committee on Small Business on Problems Involved in the Marketing of Grain and Other Commodities* 93rd Cong. 1st Sess. July 25, 26: Sept 18, 25, 26; Oct 2, 3 and 4, 1973 at 144.
[11] *Id.* at 163.
[12] *Review of Commodity Exchange Act and Discussions of Possible Changes, Hearings Before the House Agriculture Committee*, 93rd Cong. 1st Sess. Oct. 16, 17, 18 and 24, 1973.
[13] 119 Congressional Record 41331, 41334 (House Dec. 13, 1973).
[14] CME Group Announces Retirement of Leo Melamed (CME Feb. 8, 2018) available at: http://www.cmegroup.com/media-room/press-releases/2018/2/08/cme_group_announcesretirement ofleomelamed.html
[15] *Hearings before the House Committee on Agriculture on H.R. 11955*, 93rd Cong. 2d Sess., January 23, 24, 29, 30 & 31, 1974 at 105; *see also id.* at 51 & 97 (other witnesses question the necessity of the SEC proviso).

begs the question: which opinion? The one CFTC has suddenly hatched for purposes of opposing this motion that virtual currency is a "good"? Or the one that the CFTC has maintained since 2015 that virtual currency is a "service, right or interest"?

It is doubtful that "a question of [such] deep 'economic and political significance'" is still eligible for any kind of deference after the Supreme Court's decision in *King v. Burwell*, 135 S. Ct. at 2489.[16] Assuming for the sake of argument such questions are still *eligible* for deference, neither of the CFTC's interpretations are entitled to deference.

By citing *Mead*,[17] the CFTC invokes *Skidmore* deference,[18] which provides

> that the rulings, interpretations, and opinions of [an agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.[19]

These factors each weigh against deference to the CFTC. There is no evident care in the CFTC's sudden about-face that virtual currency is a "good." That the agency engages in much care in issuing its speaking orders has long been questioned.[20] The CFTC's two opinions fail the consistency factor.[21] The CFTC has not provided evidence that its new position is the result of any formal process, while the CFTC's process in issuing speaking orders evinces little

---

[16] *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014).
[17] *United States v. Mead*, 533 U.S. 218, 234 (2001) ("*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit *some* deference" (emphasis added)).
[18] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).
[19] *Id*.
[20] *E.g.,* C. Mills & R. Nathan, *CFTC Speaking Orders: Are They Lawful*? Securities Litigation Journal 26, 27 (ABA Winter/Spring 2005) ("[CFTC speaking orders are] not issued as a result of procedures appropriate to establish binding legal precedent").
[21] *New Hampshire Hosp Ass'n v. Burwell*, 2017 WL 822094 (D. Mass. 2017) (no *Skidmore* deference where FAQs were inconsistent with prior rule).

formality.[22] Finally, the CFTC has demonstrated little if any expertise with regard to virtual currency. Its expertise is centered on derivatives trading, not virtual currency.

If that is not enough to deny deference here, what the First Circuit has pointed to as "'the most salient of the factors that inform an assessment of persuasiveness, the validity of the agency's reasoning',"[23] torpedoes any notion of giving deference. *Coinflip*, *Bitfinex*, *Primer*, and *Backgrounder* contain no reasoning whatsoever for their conclusion that virtual currencies other than Bitcoin are commodities. The reasoning offered for its new-found position that virtual currency is a "good" is unavailing, as discussed above. Accordingly, CFTC has provided no evidence that "'[it] has consulted appropriate sources, employed sensible heuristic tools, and adequately substantiated its ultimate conclusion'."[24] The CFTC's tautological "we say it's true, so therefore it must be true" falls far short of the the persuasive measure of credibility that this Court applies when deciding whether to grant the CFTC deference.

### III. The Legislative History of Section 6(c)(1) Should be Considered

CFTC argues that Section 6(c)(1) of the CEA and Regulation § 180.1(a) are unambiguous so that no analysis of the legislative history is necessary. Opp. Br. at 15. This argument ignores the well-recognized exception to this principle where

> oftentimes the "meaning –or ambiguity—of certain words or phrases may only become evident when placed in context." . . . . So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme. . . . Our duty, after all, is "to construe statutes, not isolated provisions."[25]

---

[22] See *Are CFTC Speaking Orders Lawful?* at 27; *cf. Wax v. Aventis Pasteur Inc.*, 246 F. Supp.2d 191, 194 (E.D.N.Y. 2002) (weight for fully litigated decisions).
[23] *Merrimon v. Unum Life Ins. Co*., 758 F.3d 46, 54 (1st Cir. 2014) *quoting Doe v. Leavitt*, 552 F.3d 75, 82 (1st Cir. 2009).
[24] *Tangney v. Burwell*, 186 F.Supp.3d 45, 56 (D. Mass 2016) *quoting Leavitt,* 552 F.3d at 81.
[25] *King*, 135 S. Ct. at 2489 (2015) *quoting Brown v. Williamson Tobacco Corp.*, 529 U.S. 120, 129 (2000) and *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010).

This is such a case. Inserting the language of Section 10(b) of the Securities Exchange Act into the CEA yields a very ambiguous result. The securities markets are rife with fiduciary duties and much of the fraud, such as insider trading, prosecuted under Section 10(b) and Rule 10b-5 are understood to be violations of those fiduciary duties.[26] The commodities markets, in contrast, are arm's length markets with far fewer fiduciary relationships.[27] Thus, the question of what conduct Congress was targeting by Section 6(c)(1) is not plain from the text – far from it. The legislative history clarifies this ambiguity: Congress meant to give the CFTC a more powerful tool to combat manipulations. The CFTC has not alleged that took place here and therefore has failed to state a claim under Section 6(c)(1) and Regulation § 180.1.

IV. Looking at the CEA as a Whole, Congress did not mean for CFTC be the Cop on Every Block Policing Sales Fraud

As discussed above, *King v. Burwell* instructs that the Court's duty is to interpret the CEA as a whole and not just scattered provisions of it. If, as CFTC says, intangible products can be "goods" not subject to the futures trading requirement and, thus, "commodities," and Section 6(c)(1) applies to any sales fraud in interstate commerce, CFTC would have jurisdiction over any sales fraud in interstate commerce. Congress did not intend to task an agency with only 450 or so employees stationed in a mere four offices with such a mission. Instead, as Chairman Poage stated on December 13, 1973, the Commission is to have jurisdiction over those commodities that futures are traded on, and, as Senator Cantwell explained, Congress added Section 6(c)(1) as a more powerful tool for the CFTC to combat market manipulations. Congress did not mean for the CFTC to be the cop on every block.

---

[26] *Joint Report of the SEC and the CFTC on Harmonization of Regulation*, at 7 (SEC & CFTC Oct. 16, 2009) available at: https://www.sec.gov/news/press/2009/cftcjointreport101609.pdf
[27] *Id.*

WHEREFORE, Defendants submit that the CFTC has no jurisdiction over the allegations set forth in the Amended Complaint and has failed to state a claim upon which relief can be granted. Accordingly, the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

/s/ Katherine Cooper
Katherine Cooper
 kcooper@mmlawus.com
MURPHY & MCGONIGLE P.C.
1185 Avenue of the Americas, 21st Floor
New York, NY 10036
Telephone: (212) 880-3630

*Counsel for Randall Crater*

/s/ Steven N. Fuller
Steven N. Fuller, Mass Bar. 550224
NH Bar 4813
 sfuller@mzclaw.com
MARKUN ZUSMAN FRENIERE & COMPTON, LLC
40 Grove Street, Suite 275
Wellesley, MA. 02482
Telephone: (781) 489-5464 office

*Counsel for Randall Crater and Erica Crater*

/s/ Laura Greenberg-Chao
Laura Greenberg-Chao, BBO# 650916
 lgreenbergchao@henshon.com
HENSHON KLEIN LLP
120 Water Street, 2d Floor
Boston, Massachusetts 02109
Telephone: (617) 367-1800

*Counsel for Relief Defendants Kimberly Renee Benge; Kimberly Renee Benge d/b/a Greyshore Advertisement aka Greyshore Advertiset; Barbara Crater Meeks, Greyshore, LLC; and Greyshore Technology, LLC*

/s/ Ray Chandler
Ray E. Chandler, #93
 rchanatty6@aol.com
CHANDLER & JENNINGS, LLC
1060 E. Montague Avenue, Ste. 301
N. Charleston, SC 29405
Telephone: (843)745-4542

*Counsel for Randall Crater and Erica Crater*

Date: June 1, 2018

## **LOCAL RULE 7.1 CERTIFICATION**

I, Katherine Cooper, counsel for Defendant Randall Crater, hereby certify that I have conferred with counsel for the Plaintiff, Jonah McCarthy, in a good faith attempt to resolve or narrow the issues concerning this request.

    /s/              Katherine Cooper
Katherine Cooper

## **CERTIFICATE OF SERVICE**

I, Katherine Cooper, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 1, 2018.

    /s/              Katherine Cooper
Katherine Cooper